# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2014 APR 14  PM 3: 31

DEPUTY CLERK __D.A__

MOTION UNDER 28 U.S.C. SECTION 2255,
TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A
PERSON IN FEDERAL CUSTODY

| | |
|---|---|
| UNITED STATES OF AMERICA | __F.P.C. TERRE HAUTE__ |
| | PLACE OF CONFINEMENT |
| vs. | __44899-177__ |
| | PRISONER ID NUMBER |
| __MICHAEL D. GOODWIN__ | __2:12-CR-037-J__ |
| MOVANT (full name of movant) | CRIMINAL CASE NUMBER |

(If a movant has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion in the federal court which entered the judgment.)

---

## INSTRUCTIONS - READ CAREFULLY

1.   This motion must be legibly handwritten or typewritten, and signed by the movant under penalty of perjury. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form.

2.   Additional pages are not permitted except with respect to the facts which you rely upon to support your grounds for relief. No citation of authorities needs to be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

3.   Upon receipt, your motion will be filed if it is in proper order. No fee is required with this motion.

4.   If you do not have the necessary funds for transcripts, counsel, appeal, and other costs connected with a motion of this type, you may request permission to proceed *in forma pauperis*, in which event you must execute the declaration provided with this motion, setting forth information establishing your inability to prepay the fees and costs or give security therefor. If you wish to proceed *in forma pauperis*, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution.

5.   Only judgments entered by one court may be challenged in a single motion. If you seek to challenge judgments entered by different judges or divisions either in the same district or in different districts, you must file separate motions as to each such judgment.

6.   Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the motion you file seeking relief from any judgment of conviction.

7.   When the motion is fully completed, the original and two copies must be mailed to the Clerk of the United States District Court for the Northern District of Texas at the appropriate divisional office whose address is:

Abilene Division
P.O. Box 1218
Abilene, TX 79604

Amarillo Division
205 E. 5th St, Rm 133
Amarillo, TX 79101

Dallas Division
1100 Commerce, Rm 1452
Dallas, TX 75242

Fort Worth Division
501 W. 10th St, Rm 310
Fort Worth, TX 76102

Lubbock Division
1205 Texas Ave., Rm 209
Lubbock, TX 79401

San Angelo Division
33 East Twohig St, Rm 202
San Angelo, TX 76903

Wichita Falls Division
P.O. Box 1234
Wichita Falls, TX 76307

8.   Motions which do not conform to these instructions will be returned with a notation as to the deficiency.

# MOTION

1. Name and location of court that entered the judgment of conviction you are challenging:

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

2. Date of the judgment of conviction:

APRIL 9, 3013

3. Length of sentence:  50 MONTHS

4. Nature of offense involved (all counts):

HEALTH CARE FRAUD AND AIDING AND ABETING

5. (a) What was your plea? (Check one)

Not guilty ☐   Guilty ☒   Nolo contendere (no contest) ☐

(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or or indictment, what did you plead guilty to and what did you plead not guilty to?

6. If you went to trial, what kind of trial did you have? (Check one)   Jury ☐   Judge Only ☒
7. Did you testify at the trial? (Check one)   Yes ☐   No ☒
8. Did you appeal from the judgment of conviction? (Check one)   Yes ☐   No ☒
9. If you did appeal, answer the following:

Name of Court:   N/A

Result:

Date of result:

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any federal court?

Yes ☐    No ☑

11. If your answer to 10 was "Yes" give the following information:

Name of Court:   N/A

Nature of proceeding:

N/A

Grounds raised:

N/A

Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐    No ☑

Result:

Date of result:   N/A


As to any *second* petition, application or motion, give the same information:

Name of Court:   N/A

Nature of proceeding:   N/A

N/A

Grounds raised:

N/A

Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐    No ☐

Result:   N/A

Date of result:   N/A

As to any *third* petition, application or motion, give the same information:

Name of Court: _____ N/A _____

Nature of proceeding: _____

N/A

Grounds raised:

N/A

Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐      No ☑

Result: _____ N/A _____

Date of result: _____ N/A _____

Did you appeal to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?

| | | | |
|---|---|---|---|
| First petition, etc. | Yes ☐ | No ☑ |
| Second petition, etc. | Yes ☐ | No ☑ |
| Third petition, etc. | Yes ☐ | No ☑ |

If you did not <u>appeal</u> from the adverse action on any petition, application or motion, explain briefly why you did not:

NOT APPEALED AT ALL.

12. State <u>concisely</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

> **CAUTION:** If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed. However, you <u>should raise in this petition all available grounds</u> (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

<u>DO NOT CHECK ANY OF THESE LISTED GROUNDS.</u> If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any of these grounds.

(a)     Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b)     Conviction obtained by use of coerced confession.

(c)     Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)     Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e)     Conviction obtained by a violation of the privilege against self-incrimination.

(f)     Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)     Conviction obtained by a violation of the protection against double jeopardy.

(h)     Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i)     Denial of effective assistance of counsel.

(j)     Denial of right to appeal.

A.    Ground One:

SEE ATTACHED

Supporting FACTS (tell your story briefly without citing cases or law):

SEE ATTACHED

B.    Ground Two:

SEE ATTACHED

Supporting FACTS (tell your story briefly without citing cases or law):

SEE ATTACHED

C.    Ground Three:

SEE ATTACHED

Supporting FACTS (tell your story briefly without citing cases or law):

SEE ATTACHED

D.   Ground Four: _____

SEE ATTACHED

Supporting FACTS (tell your story <u>briefly</u> without citing cases or law): _____

SEE ATTACHED

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them:

SEE ATTACHED

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
   Yes ☐   No ☒   * Motion to Withdraw Guilty Plea filed April 9, 2014

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

   (a) At preliminary hearing: _____

UNKNOWN

(b) At arraignment and plea:

CLARK W. HOLESINGER

(c) At trial Pre Sentencing Conference (Trial = N//A)

CLARK W. HOLESINGER
WILLIAM F. KELLY III
DAVID DEBOER

(d) At sentencing:

CLARK W. HOLESINGER
WILLIAM F. KELLY III
DAVID DEBOER

(e) On appeal

N / A

(f) In any post-conviction proceeding:

UNKNOWN

(g) On appeal from any adverse ruling in a post-conviction proceeding:

N / A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?

Yes ☑   No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes ☐   No ☑

(a) If so, give name and location of court which imposed sentence to be served in the future:

N/A

(b) And give date and length of sentence to be served in the future:

N/A

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ☐   No ☑

Wherefore, movant prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature

_____
Firm Name (if any)

Po Box 33
_____
Address

TERRE HAUTE, I.N. 47808
_____
City, State & Zip Code

_____
Telephone (including area code)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.
Executed on   4-9-2014   (date).

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>          Plaintiff (Respondent),<br><br>     v.<br><br>MICHAEL DAVID GOODWIN,<br>          Defendant (Petitioner). | Cause No. _____<br><br>Criminal Case Information:<br><br>Hon. Judge Mary Lou Robinson<br>Case No. 2:12-CR-037-J |

## ALL GROUNDS FOR RELIEF FOR PETITIONER'S MOTION UNDER §2255

COMES NOW Petitioner (Defendant in the above mentioned matter),
MICHAEL DAVID GOODWIN Pro Se, and states as follows:

Petitioner substitutes the following for pages 7 and 8 of his
Motion under 28 U.S.C. §2255 (Please find attached each ground for
relief), hereby incorporated herein.

DATED: April 9th, 2014.

Respectfully Submitted,

Michael David Goodwin
Pro Se Petitioner

Federal Prison Camp
Reg. No. 44899-177

F.P.C. Terre Haute
P.O. Box 33
Terre Haute, IN 47808

## CERTIFICATE OF SERVICE

I, Michael David Goodwin, certify that a TRUE and accurate copy
of the foregoing was filed with the United States District Court for
the Northern District of Texas, Amarillo Division, by placing the
documents in the F.P.C. Terre Haute's legal mailbox and / or handed
these documents to the appropriate Federal B.O.P. officials, consis-
tent with the Houston v. Lack mailbox rule, with First Class postage
affixed.

Michael David Goodwin #44899-177          Recieved by: _____ 4/9/14

GROUND NUMBER ONE: <u>INEFFECTIVE ASSISTANCE OF COUNSEL IN AN EFFORT</u>
<u>TO COVER UP COUNSEL'S INVOLVEMENT IN A SCHEME TO EMBEZEL AND STEAL</u>
<u>FUNDS.</u>

<u>SUPPORTING FACTS FOR GROUND NUMBER ONE</u>

Trial Counsel's motivation in convincing Petitioner (Defendant) to plead guilty  was based on the fact that counsel wanted  to cover up his own involvement in his (counsel's) scheme to embezel and steal funds from Defendant and his businesses. [Counsel did in fact embezel and steal more than $385,000 from Defendant and his business-es.] Counsel knew that if Defendant went to trial, it would be like-ly that his (counsel's) embezelment and theft of Defendant's funds would become widely known. As a result of this fact, Counsel was desperate to convince Defendant to plead guilty, in spite of Defend-ant's unwavering insistance of his innocence.

- 1 -

GROUND NUMBER TWO:     <u>INEFFECTIVE ASSISTANCE OF COUNSEL DUE TO</u>
<u>COUNSEL'S SCHEME TO COOPERATE WITH U.S. ATTORNEY AND COERCE</u>
<u>DEFENDANT TO PLEAD GUILTY.</u>

### SUPPORTING FACTS FOR GROUND NUMBER TWO

Trial Counsel's desire to cover up his (Counsel's) own embezelment
and theft from Defendant's businesses (the subject of Ground No. 1)
resulted in Counsel's scheme to force Defendant to plead guilty.
Counsel's scheme included convincing Defendant that he was broke and
could not defend himself. By informing Defendant that since he no
longer had funds to pay attorney's fees, counsel insisted (and Def-
endant was forced to believe) it would not be possible to put on any
kind of cohesive or substantial defense. Given Defendant's lack of
funds to put on a defense (caused by Defendant's own attorney's
embezelment and theft), the Government's 97% conviction rate, and
Counsel using the AUSA's threat to proscute Defendant's wife and
unindicted daughter-in-law, although innocent of all charges, had no
choice other than to plead guilty. [As this Honorable Court knows,
this is a common coercive technique perpetrated by U.S. Attorney's
Offices nationwide.] The U.S. Attorney's 97% conviction rate, nation-
wide is touted. It is made clear to the Defendant  that if he or she
does not plead guilty, his loved ones (almost always including the
Defendant's spouse) will be prosecuted, tried and convicted, regard-
less of the spouse's complete innocence. By preventing Defendant
from going to trial, Defendant's own attorney aided and abetted the
AUSA in coercing Defendant into pleading guilty. And since Counsel
Holesinger knew Defendant was innocent and continued to profess his
innocence to the very end, Counsel is also guilty of suborning
perjury.

Once the AUSA's coercion succeeded, the indictment against Defendant's wife was dropped 'without prejudice,' on the Government's Motion. The AUSA moved for a dismissal 'without prejudice' because there was a danger that the Defendant might later recant the guilty plea. Therefore, the AUSA specifically head (under seal) the indictment against the Defendant's wife dismissed 'without prejudice.' Clearly this was motivated by the AUSA's need to be able to continue or reinstate the coersion if the Defendant attempted to withdraw his guilty plea. However, the coersion (threat to prosecute loved ones) also extended to Defendant's daughter-in-law, who was never indicted.

The mere fact that the blackmail scenario, outlined above, occurs in a very large number of cases and by nearly all AUSAs, should not deter this Honorable Court from its duty to allow Defendant to withdraw his guilty plea, since, in this case, the Defendant's own attorney supported the coercion, in order to cover up his own embezelment and theft from Defendant's businesses. Coercion is abhorent, even when Courts rule it legal. When coersion extends to individuals who are not indicted and when the scheme is participated in and furthered by Defendant's own counsel, it must not be allowed to stand.

The following citation is hereby incorporated by reference herein.


United States v. Nuckols, 606 F.2d 566, 569 (5th Cir. 1979)

Threatening prosecution of a third party family member is not itself legally wrong; it is the threat of prosecution, in the absence of probable cause, that is unlawful.

GROUND NUMBER THREE:   <u>INEFFECTIVE ASSISTANCE OF COUNSEL AND CO-</u>
<u>COUNSEL AS A RESULT OF MISCONDUCT ON THE PART OF BOTH COUNSEL AND</u>
<u>CO-COUNSEL.</u>

SUPPORTING FACTS FOR GROUND NUMBER THREE

After representing Defendant exclusively for about 12 months, up to
the Arraignment during January of 2013, Defendant was informed that
due to Counsel's law practice being outside Texas and the fact that
Counsel had not practiced in that District before (he was not famil-
iar with local rules), it was necessary for Counsel to hire a local
attorney, William E. Kelly. [Defendant contends that the necessity
of local representation was obvious from early on during the repre-
sentation and would have been obtained much earlier in the represen-
tation if it had not been for the fact that Counsel was motivated
(in his decision making) by his desire to cover up his scheme to
embezel substantial amounts of money from Defendant's businesses, as
well as several other businesses that were otherwise located in
Indiana. See attached Exhibit A, Section 1, a letter from Prosecuting
Attorney in the 67th Judicial Circuit of Indiana, dated April 1,
2014, for supporting evidence regarding Counsel's embezelment activ-
ities.] Counsel could not serve two masters. Counsel decided not to
provide effective / adequate assistance to Defendant, and instead
decided that concealing his (Counsel's) own embezelment of of Defend-
ant's funds was  the only important factor.

A few months prior to Defendant being forced to take a plea
agreement, Counsel hired attorney Kelly, who told Defendant on sever-
al occassions that he could do a better job of representing him if
the principle attorney (Counsel Holesinger) would share case informa-

- 5 -

tion with him. When Defendant asked Counsel Holesinger to share case information with co-counsel Kelly, Counsel Holesinger responded that he did not want Counsel Kelly involved in the case information any further. Counsel Holesinger was ineffective because his goal was to conceal his own embezelment, not to represent Defendant.  Counsel Holesinger was ineffective because he, in his attempt to keep Kelly from discovering his embezelment, concealed critical defense information from Kelly. Kelly was ineffective because all important defense information was kept from him by Holesinger. After being Defendant's 'local' attorney for a few months (about two weeks prior to being forced by his attornies to plead guilty), Defendant was informed that a conflict of interest existed and therefore, Counsel Kelly would represent Defendant's wife and Defendant would only be represented by Counsel Holesinger. Several days after this new attorney representation scheme was devised, Defendant and his wife were in Counsel Kelly's office. Both Defendant and his wife  were crying and insisting to Kelly that they were completely innocent. In spite of this fact, Kelly, who no  longer represented Defendant, again pressured Defendant to decide on a plea, to save his wife. Kelly told Defendant that "the Prosecutor is going to dinner. If you don't agree to a plea before she leaves, you're going to jail for a very long time and Patty [Defendant's wife] will also pay the price. I need to have your answer right now, before the agreement to drop the charges against her is off the table" [See Exhibit B, Defendant's Affidavit and Exhibit C, Defendant's wife statement]. At this point, Defendant was still insisting on his innocence. [Both Defendant and his wife tearfully insisted that they were innocent for about 30 minutes.] Then Counsel Kelly called Counsel

Holesinger and got him in the conversation. [Please keep in mind that while Kelly was putting all this pressure on Defendant to plea, Kelly no longer was Defendant's attorney. He represented Defendant's wife.] As stated, a telephone call was then placed and Counsel Holesinger joined in the conversation remotely. Holesinger's scheme became obvious when Holesinger informed both Defedant and his wife, "I see no other way out. You're out of money!" He explained that an extended trial with proper defense was impossible and "if you go to trial, without an adequate defense, not only would both of you be convicted, but your office manager and possibly your daughter-in-law would also be convicted." Counsel Holesinger also stated that such an extended defense would certainly fail and in the process "bankrupt everyone involved" [See Exhibit B, Defendant's Affidavit]. Confronted with this overwhelming pressure, while the Defendant and his wife continued to insist on their complete innocence, Defendant agreed to plead guilty. There can be no better example of an attorney involved in a conflict of interest than Counsel Holesinger and his attempt to hide his embezelment from Defendant. However, Counsel Kelly allowing himself to be in a room with the Defendant and his wife, several days after Kelly had informed Defendant that a conflict of interest existed and he could no longer represent Defendant, is another example of gross attorney misconduct.

GROUND NUMBER FOUR:    <u>INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE</u>
<u>TO REVIEW OR EXPLAIN EXTREMELY IMPORTANT FACTS REGARDING SENTENCING.</u>

<u>SUPPORTING FACTS FOR GROUND NUMBER FOUR</u>

As a result of the above-referenced coercion to cover up Counsel's
embezelment and theft of funds from Defendant's businesses, Counsel
intentionally failed to review or explain anything, with Defendant,
regarding the sentencing process. Counsel did not discuss the fact
that the Government was seeking $1.8 Million dollars in restitution
or how that obligation would affect Defendant. Defendant was never
told that the Court's special conditions of Supervised Release would
include a required $1,000 per month payment, which Defendant will
never be able to afford, after his release from BOP. Counsel failed
to explain the Guidelines, the sentencing calculations and failed to
go over the Government's calculation regarding Defendant's sentence
recommendation. Defendant was never shown his Pre-Sentence Report
(PSI) and Counsel never made any  objections to either the calcula-
tion or the Government's Version of the Offense. Counsel's conceal-
ment of the PSI, from Defendant, was perpetrated in order to convin-
ce him that his sentence would be two years or less. [In furtherance
of Counsel Holesinger's embezelment scheme, it was essential for him
to get the conviction finalized, to keep the scheme from being ex-
posed.] Counsel could not file motions or objections, regarding the
PSI, because he could not afford to allow his client (Defendant) to
question the  content of the PSI.

Counsel failed, utterly and completely to follow through on his
promise to Defendant to introduce mitigating circumstances at Sent-
encing. Counsel also failed to argue downward departures, Safety

- 8 -

Valve or any §3553 Factors. Counsel failed to challenge the PSI's determinations that Defendant was not entitled to Downward Departures and failed to argue any mitigating factors.

During Sentencing, Counsel raised no issues, made no objection and failed to aid the Defendant in any way. Clearly Counsel had an obligation to discuss or explain any mitigating circumstances. When Defendant was asked a question, by the Court, Counsel whispered to him, "just answer yes" [See Exhibit B, Defendant's Affidavit]. After Sentencing, Counsel failed to discuss the Court's "Statement of Reasons" [Doc 136], including the aparemently contradictory statement, under Section IV of that document entitled "Advisory Guideline Sentencing Determination," where the Court stated that "The Sentence is within an advisory guideline range that is not greater than 24 months."

GROUND NUMBER FIVE:    INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE

TO REVIEW OR INVESTIGATE (a) ANY AND ALL POSSIBLE DEFENSES, (b)

WITNESSES, (c) EXCULPATORY EVIDENCE PROVIDED BY DEFENDANT.

### SUPPORTING FACTS FOR GROUND NUMBER FIVE

Counsel provided ineffective assistance of counsel for failure to
review or investigate Defendant's Defense theory of the case, which
Defendant presented with unwavering insistance of his innocence.
Counsel was told again and again, we never before "dealt with Med-
icaid." We purchased an ongoing medical practice [Exhibit A, Section
2, Letter to Judge]. Defendant asserted to Counsel that there were
many problems and they exerted every possible effort to correct
violations of "HIPPA, OSHA, ACCOUNTABILITY and NEPOTISM" [Exhibit A,
Section 10, Timeline]. Defendant discovered unprofessional activities
practiced by Defendant's inherited staff. Defendant told his Counsel:
"We decided to buy land and build a clinic for these children and
solve the problems we inherited." This was an overwhelming process
that "incurred approximately $3 million dollars in debt, to help
solve these inherited problems... I leveraged everything my wife and
I [earned] over forty-two years" [Exhibit A, Section 2, Letter to
Judge]. Defendant was incredulous regarding how any of his actions
could be thought of as fraud. Counsel knew his Defendant was innocent
of all charges. Counsel also knew that all issues / activities con-
cerning Medical Fraud were already taking place prior to the time
Defendant took over the practice.

Counsel failed to investigate or interview any witnesses. It
appears that Counsel never even hired an investigator to assist in
locating or contacting witnesses. Defendant asked Counsel to speak

with Dr. Rupert Barron, DDS, who would have testified for Defendant. Counsel never even attempted to interview Dr. Barron. He would have testified that while working with Dr. Goodwin or working alone in the office, he never saw any intent to commit fraud by Dr. Goodwin or his staff. If he had ever witnessed any irregularities that constituted fraud, he would have resigned [quoted from Exhibit  D , Letter from Dr. Barron dated April 3, 2014]. His testimony would have included, "several times during my employment, the office requested a representative from Medicaid to come and... make sure the office was in compliance" [Exhibit D, Letter from Dr. Barron dated April 3, 2014].

Counsel failed to interview Tammy Naverette. Tammy would have testified for the Defendant and was questioned at the first Grand Jury Hearing, which did not result in any indictment. Tammy would have rebutted everything the AUSA presented, just as she did in front of the Grand Jurty. Her testimony would have been invaluable. She would have testified regarding: how Defendant did all the diagnosis and treatment plans, HDL forms, daily diagnosis, placed the braces and was always properly  supervising over the orthodontic assistants work. She would  also have stated that the Defendant changed the flawed practices of the staff after he took control. He stopped the staff from using finishing burs to remove  glue from the teeth during debonding (which is against Dental Assisting Guidelines) and had them change to Soft White Stones that would not remove enamel in the process. In summary, Defendant reformed flawed office and treatmetn procedures. This was done in spite of the fact that Medicaid Officials refused to provide significant input regarding proper procedures.

Defendant also asked Counsel to interview Medicaid  Agents and obtain Agent's notes from the Computer Records. Although the afore-

mentioned Medicaid Agents and Records would have provided proof that
Defendant had nothing to do with the Fraud allegedly perpetrated on
Medicaid, those Agents were never interviewed and the Records never
obtained. The Records would have proven that the Medicaid Fraud was
initiated well before Dr. Goodwin took over the practice. Hence, the
Records would have shown that Defendant Goodwin had nothing to do
with the Fraud against Medicaid. The Records would have proven and
will still prove that the same office staff members that accused
Defendant of Fraud were the ones who actually perpetrated the Fraud
against Medicaid. Counsel never interviewed Annette Hastings. This
honest lady would have been very valuable as a witness or a co-Def
endant. Mrs. Hastings would have testified to the malicious conduct
perpetrated by Sandy and Lissa (the whistleblowers). They attempted
to sabotage the practice just prior to they're staged walk-out. They
sabotaged many patient charts by mixing a large number of medical
records, one to the other jeopardizing their care. In Mrs. Hastings
notes, she reported her suspicion that one of them took her note
book that guided her on how the Medicaid billing was done and what
procedure codes to use, etc. [Exhibit A, Section 7]. As a result of
Counsel's failure to interview any of the Practice's staff, he pro-
vided ineffective assistance.

Further ineffective assistance occurred when Counsel failed to
review exculpatory documents provided by Defendant or to request, by
filing a motion to obtain discovery, Brady material, Agent F302s or
Grand Jury transcripts. Many exculpatory documents were provided to
Counsel. Examples include Exhibits E through H, which were apart of
Defense related files provided to Counsel to refute various counts
(Here the examples were for Counts 5,6,7,10 & 11) [Exhibits E thru H].
Counsel concealed and failed to make use of those documents.

GROUND NUMBER SIX:   <u>INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE</u>
<u>TO QUESTION MEDICAID EMPLOYEES WHO WERE FORCED  INTO SILENCE /</u>
<u>FAILURE TO COOPERATE BY THE AUSA AND MEDICAID SUPERIORS.</u>

<u>SUPPORTING FACTS FOR GROUND NUMBER SIX</u>

Ineffective assistance of Counsel for failure to file a motion with
the Court regarding the silencing of Medicaid Agents and Supervisors
by the Government. Defendant informed Counsel, as Dr. Barron's Letter
confirmed [See Exhibit D], that Medicaid Agents knew that Defendant
was exemplary in his multiple efforts to continually confirm the
Practice's compliance with Medicaid Rules and Regulations. Those
Agents in communication with Defendant's Office included a Field
Representative (Mrs. Emily Singleton), Two District Medicaid Repres-
entatives, and Mr. James Cooper from the Medicaid Complaint Division
[See Exhibit I]. In conversations with these representatives, it was
clear that their Agency computers retained Records regarding calls
that were received from Medical providers. After initiating an in-
vestigation into Medicaid Fraud, Defendant's Practice was unable to
discuss anything with their former contacts with  the Agency. They
were told by superiors not to discuss anything with Defendant or his
staff. By silencing these potential witnesses and not providing
computer Records, the Government interferred with Defendant mounting
a defense. It was Counsel's duty to investigate this attempt to con-
ceal exculpatory information. Any competent attorney would have
investigated the AUSA's concealment of exculpatory information.

GROUND NUMBER SEVEN:   <u>INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING</u>
<u>TO MAKE THE COURT AWARE OF THE ISSUES DISCUSSED BY DEFENDANT IN HIS</u>
<u>POST SENTENCING LETTER TO THE COURT.</u>

<u>SUPPORTING FACTS FOR GROUND NUMBER SEVEN</u>

Petitioner hereby incorporates Exhibit A herein. [See Exhibit A, Section 2]

Further, Petitioner hereby incorporates by reference, Defendant's "MOTION TO WITHDRAW GUILTY PLEA" filed April 9th, 2014 pursuant to the Houston v. Lack Mailbox Rule; and all proceedings in that matter incorporated herein.

GROUND NUMBER EIGHT:   <u>CONVICTION OBTAINED BY THE UNCONSTITUTIONAL</u>
<u>FAILURE OF THE PROSECUTION TO DISCLOSE TO THE DEFENDANT EVIDENCE</u>
<u>FAVORABLE TO THE DEFENDANT.</u>

SUPPORTING FACTS FOR GROUND NUMBER EIGHT

The prosecution knew evidence from Medicaid (including Centers for
Medicare / Medicaid Services, known as CMS) itself would prove that
any fraud perpetrated against Medicaid pre-dated Defendant's time
with Charles Osborn, DDS, PA. [The business name was changed to
Goodwin Orthodontics, PLLC.] The prosecution prevented Medicaid
employees from sharing exculpatory material with Defendant. The
prosecution deliberately prevented Medicaid employees / represent-
atives from disclosing exculpatory material, which was either in
the prosecution's  possession or its agents, or readily obtainable
by the prosecution.

- 15 -

GROUND NUMBER NINE:   <u>DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL</u>

<u>SUPPORTING FACTS FOR GROUND NUMBER NINE</u>

As stated in other documents and supporting facts, Counsel Holesinger embezeled more than $380,000 from Defendant [Exhibit A, Section 1]. As a result of Counsel Holesinger's priority being to prevent discovery of the embezelment, it was not possible for him to provide Defendant effective assistance

- 16 -

# PERTINENT MEMOS TO MICHAEL D. GOODWIN'S DEFENCE

1. PORTER COUNTY

2. LETTER TO JUDGE MARY LOU ROBINSON

3. MEMO TO FILE DR. BARON'S MAY 16, 2012 JURY IN FT. WORTH

4. CLARK HOLESINGER'S CONTRACT

5. PATRICIA Y. GOODWIN'S LETTER

6. VISION / MEDICAID

7. MS. ANNETTE HASTINGS TIME LINE

8. MISSING NOTE BOOK / ANNETTE HASTINGS

9. ELANE POPOVICH'S LETTER

10. PATRICIA Y. GOODWIN'S TIME LINE

# PORTER COUNTY PROSECUTING ATTORNEY

COURTHOUSE
16 LINCOLNWAY • SUITE 546
VALPARAISO, INDIANA 46383

BRIAN T. GENSEL
PROSECUTING ATTORNEY

T. MATTHEW FROST
CHIEF DEPUTY

TELEPHONE:
(219) 465-3415
FAX: (219) 465-3346

SUPPORT / PATERNITY
(219) 465-3405
FAX: (219) 465-3689

April 1, 2014

To Whom it May Concern,

Re: United States of America v. Michael D. Goodwin

I am the Prosecuting Attorney for the 67th Judicial Circuit of Indiana. I have recently charged attorney Clark Holesinger with theft for numerous instances of stealing client funds in Porter County, Indiana. Mr. Holesinger has resigned his license to practice law in Indiana as a result of his inability to refute the theft allegations. Based upon information gleaned from the on-going investigation involving other client victims, it is my belief that attorney Holesinger stole approximately $380,000.00 from Dr. Michael Goodwin and his wife Patricia Goodwin. This occurred during the time he represented Dr. Goodwin for Medicaid fraud. I anticipate formally charging him with this theft in the near future.

Very Truly Yours,

Brian T. Gensel

Prosecuting Attorney
67th Judicial Circuit of Indiana

Honorable Judge Mary Lou Robinson
Room 226
Box F-13248
Amarillo, Texas 79101-1559

April 24, 2013


Dear Honorable Judge Robinson,

First and foremost I want to thank you for allowing my wife, Patricia, to communicate this to you. We understand that this is not usual, and we are both very grateful.

I wish to apologize for not being able to talk with you in person but the obvious circumstances prevent me from doing so.

Now that my wife and I have lost everything, I wish for you to know the truth. When you asked the question if the Resume was correct, I answered "Yes" because I so feared that the Attorney General would follow through with prosecuting my wife and my office manager, Annette Hasting, if I did not plea. Consequently my decision was to plead guilty to save them. The point is I pleaded guilty to a fraud that I did not commit. I am very sorry to have lied to you but I wish to get this off my chest and the truth to be told. Please allow me to tell you our side of our story. I believe that I have been accused of malicious wrong doing by several former disgruntled employees, two sisters and a sister-in-law, who were existing employees of the practice when purchased in 2008.

An orthodontic assistant from Amarillo, Lisa Backus, called me to tell me that the Orthodontist in Amarillo, Dr. Charles Osborn, was terminally ill and his wife was in desperate need to sell the practice.

Approximately in July of 2007 when Patty and I went to see the practice, after several calls from Mrs. Joan Osborn, we were appalled to see that the patients were being neglected by Dr. Charles Osborn due to his health, something over which he had no control. The very first day we arrived to see the practice, with Dr. and Mrs. Osborn, we were immediately asked to help out because Dr. Osborn was very ill and needed to go home. I observed the office and my wife offered to help in sterilization. My observation was that these orthodontic assistants were doing everything without the guidance of an orthodontist because of Dr. Osborn's medical condition.

At our age, my wife and I struggled to make the decision because we had never dealt with Medicaid and purchasing a practice at 1.45 million dollars was overwhelming. I was compelled to help Mrs. Osborn because nobody in Amarillo wanted to buy the practice because it was a

1

Medicaid practice.  From June to December of 2007 we were asked by Dr. and Mrs. Osborn to help them until we made a decision to purchase the practice. Dr. Osborn's health prevented him

from helping me at all with Medicaid and introducing me to his patients' treatments.  We immediately applied for a Medicaid and Texas Dental License in order to be in compliance with the law.  We decided to help Mrs. Osborn and buy the practice and in January of 2008 the purchase was done.

When we purchased the practice, we knew the practice was in violation of HIPPA, OSHA, NO ACCOUNTABILITY, and NEPOTISM.

We were very concerned with HIPPA because in my observation, before I purchased the practice, the staff was doing everything for Dr. Osborn.  The staff did all the records, diagnosis for treatment plan, placed all the braces, diagnosed the daily treatment and filled the HDL forms and signed them with a stamped signature, which I still have today.  Charts were being taken out of the office and billing was being submitted to Medicaid from the employee's home.  Charts were not secured allowing anyone entering the office full view of other patient's charts and insurance.

We were concerned with OSHA because the assistants wore sandals, ate and stored food where the x-ray machine was located. They also stored food in a small refrigerator with dental chemicals. My wife and I were appalled at the condition of the patient's brushing area. The sink was always clogged with saliva and blood and because the area was carpeted, it reeked of urine.

There was no ACCOUNTABILITY in the office.  The patients did not have a ledger for their Medicaid accountability.  When the patients paid cash, it was NOT recorded or accounted for since there was no ledger for them.  However, we later found out that Medicaid patients were not supposed to be charged for anything.

Nepotism was a big concern.  Three sisters held very important positions in the office.  Kristen De Los Santos was the office manager and was also an orthodontic assistant.  Her pay was $30.00 an hour and a bonus of $1,350.00 to $1,500.00 at the end of each month. Kristin was also running her own candle business through the office and people were calling to pick up their purchases since the product was being delivered to the office. Lisa Eason, Kristin De Los Santos sister, was in charge of submitting the Medicaid insurance. Her pay was $25.00 an hour with a bonus of $900.00 to $1,350.00 each month.  Lisa Eason took charts home and submitted Medicaid billing from her own home computer. Sandy De Los Santos, sister-in-law to Kristin De Los Santos, was in charge of scheduling.  Her pay was $25.00 an hour and a bonus of $900.00 to $1,350.00 each month.  Our solution to this problem was to get a full time office manager that would help make changes and put the office in compliance with The Texas State Dental Board and Medicaid.

We decided to buy land and build a clinic for these children and solve some of the problems we inherited. My wife and I had mounds of paper work that needed to be done, from changing accounts, utilities, membership dues, and supplies to the overwhelming process of borrowing 1.45 million dollars, paid to Dr. and Mrs. Charles Osborn, for the practice, 275 thousand dollars

2

for the land and 1.25 million dollars for the construction of the building. I incurred approximately 3 million dollars in debt to help solve these inherited problems, not to fraud the government. Had I wanted to do that, I could have stayed with the original office and paid myself even more money. This all transpired during the year 2008.

During the first few months we asked for a Medicaid representative to come to the office to make sure we were in compliance. Ms. Emily Singleton, who was the Medicaid representative, came to the office for the first time in April of 2008 without notice. She brought in coffee mugs and pencils and stated she had no time to speak with me at this time because she had other commitments. My wife requested many times for Ms. Singleton to come to the office because both my wife and I had questions regarding practices and procedures. It was not until June of 2008 that she finally returned. Present in the meeting, besides my wife and I, was Kristin De Los Santos and Lisa Eason. I stated to her that the brackets on the patients were not positioned correctly and that I would not be able to finish the treatment properly unless I repositioned the brackets. I also informed her that 8 out 10 patient's gums were infected and wires needed to be removed so they could be seen by a dentist. After reviewing photos of the patients, Ms. Singleton agreed brackets needed to be repositioned and wires needed to be removed. Ms. Singleton gave her consent to bill Medicaid for these procedures. I asked at this time if we were in compliance with Medicaid and she stated, "The staff has many years of experience and knows all about Medicaid so stick with them." That was her answer to my question about us being in compliance with Medicaid.

Ms. Annette Hastings came to access the position as the office manager in the latter part of February 2009. After her evaluation of the office, she expressed very strongly that the office was in violation of HIPPA, OSHA, NO ACCOUNTABILITY, and NEPOSITM. My wife and I had told Ms. Hastings that we had a solution. We took her to see the construction of the new clinic. She made a decision and took the position as an office manager after viewing all that we were doing to solve the inherited problems. Ms. Hastings started working for us March 1, 2009 and had her first meeting with the staff that day.   She told them about the new clinic and how policies and procedures were going to change for the better.  Lisa Eason and Sandy De Los Santos expressed the need for more help in the front office. Ms. Hastings set up three job interviews before she went back to Colorado on March 19, 2009 to help Lisa and Sandy in the front office. When Ms. Hastings arrived in Colorado on March, 19th she got a call from Lisa Backus, who was answering the phones at the office, telling her that Kristin De Los Santos was removing braces off of a patient without a doctor in the office. Kristin had a letter from Mrs. Joan Osborn giving her permission to remove the braces but the practice no longer belonged to Dr. Osborn. Ms. Hastings called my wife and I stating she had accepted the position as the office manager and was not going to tolerate this behavior and expressed that Kristin De Los Santos needed to be fired.  My wife and I agreed.  I expressed to Ms. Hastings that I was concerned about the reaction of the other two sisters over the firing. Ms. Hastings decided to come back from Colorado to Amarillo March 19, 2013, the same day she had left, in order to prevent any form of retaliation.

Our working schedule at the Amarillo office consisted of twelve days out of each month. We refer to this as a rotation. The next rotation started on March 31, 2009 at 9:00 a.m. The three girls that were applying for a job came in 15 minutes early. Ms. Hastings stated to them that only one girl was going to get the job. Lisa Eason and Sandy De Los Santos arrived in the office 10 minutes late. Lisa and Sandy requested to speak to Ms. Hastings in the storage room. Before

3

they went to the storage room Lisa approached and said to Tammy Navarrate, an orthodontic assistant, "We are giving you a heads up we are going to walk out. Do you want to walk out with us?" Tammy said "No".   After speaking to Ms. Hastings and my wife, Sandy and Lisa walked out. Ms. Hastings and my wife were left, at this time, without any knowledge of the computer program scheduling or the Medicaid insurance billing procedures.

Two hours after Lisa and Sandy walked out, Lisa's husband came to the office using profanity and being confrontational toward Ms. Hastings in front of patients and parents demanding to know why his wife was fired.  Ms. Hastings informed him that his wife was not fired but chose to walk out.  The police were called to the office because of his verbal abuse and threats.  Later that afternoon Kristin's husband, Chico De Los Santos, and Sandy De Los Santos' husband, Isaac De Los Santos, came in to speak to me.  Isaac De Los Santos demanded to know why his wife was fired.  I expressed to Mr. Isaac De Los Santos that she was not fired but chose to walk out.  To defuse the situation and cool things down I told him I may have her come back tomorrow.

That evening Ms. Hastings started pulling charts for the next day.  She discovered that all patients' charts records had been sabotaged and were completely mixed up deliberately.  Had this not been discovered, misdiagnosis of patients' procedures could have happened.  We also found out the patient schedule had been tampered with.  Some patients were schedule on the wrong day for certain procedures.  Others were scheduled and not enter into the computer so we were not expecting that patient for treatment.

The next day Mr. Isaac De Los Santos and Mr. Chico De Los Santos came to speak to me. Mr. Isaac De Los Santos asked if I would hire back his wife.  I mentioned to him what had happened to the charts and the scheduling and how they were mixed up deliberately. I said to him, "With that conduct I would always be looking behind my back and that I felt uncomfortable hiring her back."  Mr. Isaac De Los Santos asked if she was going to get her bonus. I replied, "No."  Mr. Isaac De Los Santos told me that in 20 minutes he could have people picketing outside the office and said, "I am a Union Negotiator at Pantex and I will use all of my resources to get back at you for not hiring back my wife."

From April to the end of September of 2009, my wife worked on the construction and completion of the new building including every aspect.  This was done to be more efficient and better serving of the patients' to meet HIPPA & OSHA standards.  Due to the lack of guidance from Ms. Singleton, the Medicaid Representative, Ms. Hastings was also trying hard to find Medicaid seminars to familiarize ourselves with Medicaid procedures to be in compliance in the new office.

In May of 2009 I called The Panhandle Dental Association requesting help. They highly recommended Dr. Rupert Baron. Dr. Baron had his Medicaid license and came to work for us in May of 2009. When I worked for Dr. Charles Osborn, prior to my purchasing the practice, I was given an IRS form 1099 for the amount paid to me. I spoke to Ms. Singleton and asked if I should 1099 Dr. Baron since he was only working 1 to 3 days out of the month. She said, "Yes". Dr. Baron's position was to oversee daily **prescribed procedures** which only required a two to three minute appointment. This enabled Dr. Baron to oversee at least eighty patients per day on any of his 1 to 3 working days each month. Since Ms. Singleton gave us the okay to 1099 Dr. Baron, we proceeded with this arrangement for the next couple of years.

4

Ms. Hastings worked on the transition from the old clinic to the new clinic from April, 2009 to the moving on September 9, 2009 and patients were seen on September 11, 2009. As a new Medicaid provider and after the disgruntled employees left us, my staff and I routinely asked Medicaid to please come and review our practice and procedures but to no avail. Several times a year they were asked to come, even when they were in Amarillo, and yet they did not respond. Even the forms I signed for Health and Human Services stated that if a provider requested a review of their procedures and practice, it would be granted. To say the help we were asking for from Medicaid never came, is an understatement. None of our questions were answered. Ms. Singleton routinely responded to our questions, "I'll get back to you later." That later never came. She did, however, come to the clinic in October of 2009, walked around the new clinic and left. NOTHING WAS SAID.

From late September, 2009 to February, 2010, computers were installed, integrated, and configured with all the printers in the front office, the working stations and the file room. The digital x-rays were also integrated with the computers. Time clocks, TV monitors, and security cameras were installed. The OrthoChart Program was implemented and for the first time patients' charts had ACCOUNTABILITY! We wanted to be transparent and in compliance with Medicaid and The Texas Dental Board.

On April 9, 2010 the FBI, Marc White, and Sam Martin, CPA, came to the clinic with a letter from the office of the Attorney General, Greg Abbot, requesting data. They told me that having Dr. Baron, a Medicaid licensed dentist, working for me under his license and not mine constituted fraud. Thinking they told me this, because of due process, I immediately had my accountant call for the forms necessary to comply and correct this requirement. When the forms were received my accountant called Medicaid and explained to the agent the questions she had with the forms. Much to her surprise, the Medicaid agent said, "Why are you going through all of this paper work, he is only there very part time and you could pay him with a 1099."

I was very confused at this point. I told my accountant to continue with the correction of the forms and to finalize getting Dr. Baron's license under mine. Dr. Baron did receive a letter giving him a temporary Q6 number shortly after this. There was never any attempt to scheme or fraud the government. The fact we would receive the same money for services rendered with or without this being so, why would we not want to comply?

At the beginning of the letter I told you I pleaded to one count of fraud. This fraud occurred in 2008. When I was out of town, a patient came in as an emergency because of a wire poking her mouth. The wire was clipped by an orthodontic assistant. This did not require to be billed to Medicaid. However the insurance department, under the guidance of Lisa Eason, did in fact bill Medicaid. Because of no ACCOUNTABILITY at this time, I was not able to see what had transpired during my absence.

As I am sure you are aware, the process of defending oneself against a lengthy investigation is both time consuming and horribly expensive. The government immediately froze all of our business and personal bank accounts, and refused all payments for services, even though they had been previously approved. I completed treatments at my own expense. All of this caused the banks to call due our business and personal loans. We eventually paid hundreds of dollars in

5

legal fees. The attorney hired an "expert witness" to whom I paid a large fee as well as paying my accountant for over one hundred hours of work to compile billings, records, and time sheets, evidence the court never saw. The investigation dragged on for four years. The end result of this is that we are financially ruined. I can have at your request any evidence to support my statements in this letter.

In closing, I feel without a doubt, that we have been victimized by the vengeance of disgruntled former employees and their husbands. Again, Judge Robinson I thank you for allowing me to tell you our side of the story and taking the time to read and consider this and for allowing Patricia to give it to you.

Very Respectfully,


Michael D. Goodwin

## MEMO TO FILE REGARDING DR. BARON'S

## MAY 16, 2012 QUESTIONING BY GRAND JURY IN FT. WORTH, TEXAS

- He met with grand jury for 45 minutes

- He was asked why he was working without a Medicaid number

- He was questioned about indirect bonding

- Asked what is a retie day

- Asked if Dr. Goodwin should return all the money for the days he worked

- Asked who did treatment plan

- Asked how come he didn't get to do treatment plan

- Asked how much he got paid for working

- Asked if he got paid for trip back to California

- Asked what direct supervision meant

- Made him read sections of Texas Dental Code

- After reading the code, he stated we are in compliance with Texas Dental Code

- Asked him if he remembered his Dental Law and he answered he took the jurisprudence exam and passed.  Then he asked her if she remembers all the laws she studied in school.  The jury "snickered" and she got angry.

-

# LAW OFFICES OF
# CLARK W. HOLESINGER
## ATTORNEYS AT LAW

CLARK W. HOLESINGER
219.763.7246

LYNN C. PLUISTER
219.762.7728

334 WEST 806 NORTH
VALPARAISO, IN 46385
FACSIMILE: 219.764-3625

## Attorney-Client Fee Agreement

DATE:            June 7, 2011
CLIENT NAME:     Patricia and Michael Goodwin; Goodwin Orthodontics and any affiliations

We appreciate the confidence you have shown in retaining our firm to represent you. This letter sets forth our respective participation and responsibilities in your case. You have hired us to handle the following matter for you:

Criminal and civil forfeiture and all related matters in re: your business in Amarillo, Texas        .

   1. **RETAINER**. Legal services on your case will not begin until after we have received your deposit for fees and a signed copy of this agreement, unless the attorney decides otherwise. You are required to pay a deposit of $5,000.00 to secure the services of our firm, to compensate us for assuming responsibility for your case, and to ensure our availability to represent you.

   The deposit will be applied toward payment of legal services rendered on your behalf. You authorize us to transfer expenses incurred and fees earned from our client trust account to our business account. When your credit balance with us falls below 50% of the amount of the deposit, you agree to replenish your deposit, so that you maintain a minimum credit balance on deposit with the firm at all times in the amount of at least 50% of your original advance fee. At the conclusion of the case, any unused portion of the advance will be refunded to you.

   We will send you itemized statements each month. If your statement shows a balance due to the firm, you agree to pay both that balance due and to replenish your advance deposit each time you receive a statement from us. You agree to make these required payments no later than ten (10) days from the date of the statement.

   **This firm does not finance legal services. If you fail to maintain the terms of this agreement, and to pay fees as expressly set forth herein, we may file a Motion to Withdraw as your counsel of record.**

   2. **FEE RATE**. You agree to pay the firm for attorneys' services at the hourly rate of $250.00 for services rendered. You also agree to pay the firm for paralegal and/or law clerk services rendered on your behalf at the hourly rate of $50.00. The time expended on your matter will be computed on the basis of one-tenth of an hour increments.

Any figures we quote you for the total cost of our services are merely estimates. The opposing party, the opposing attorney or others may engage in activities beyond our control, requiring us to expend additional time not originally contemplated.

3. **ADDITIONAL COSTS**. In addition, you will be responsible for all costs which we may incur on your behalf. These costs include filing fees, service of process, depositions, appraisals, witness fees, court reporter fees, copy and telephone expense, and fees for accountants, investigators, psychologists and other experts. We will consult with you prior to employing any such services. We will mutually decide whether such expert fees are paid out of the advance deposit or directly by you. You authorize us to hire other attorneys, with your prior knowledge and written consent, to work with us on this engagement, at your expense.

4. **RESOLUTION**. No resolution shall be effected without prior consultation between the parties to this Agreement.

5. **TRIAL DEPOSIT**. We make every reasonable effort to settle contested issues without the emotional and financial burden of trial. Sometimes, though, it is not possible to reach agreement. Should it become apparent that your case will go to trial, you agree to pay the firm a trial deposit in an amount to be determined by the attorney, within one week after we notify you of the amount required. If your case is subsequently resolved without the necessity of a trial, any unused portion of your deposit will be refunded to you. If you do not pay the trial deposit within one week of notification, we may file a Motion to Withdraw in your case.

6. **TERMINATION**.

(a) We reserve the right to terminate this agreement for any of the following reasons:

1. You fail to pay fees, costs, advance fee replenishment or trial deposits in accordance with this agreement.

2. You fail to cooperate and comply fully with all reasonable requests of the firm in reference to your case.

3. You insist on pursuing an objective that the firm considers repugnant, illegal or imprudent, or contrary to your legal best interest.

4. You engage in conduct which makes it unreasonably difficult to carry out the purposes of this employment.

5. Any other reason allowed under the Indiana Rules of Professional Conduct.

(b) You have the right to terminate our services upon **written** notice to that effect. You will be responsible for any fee for services performed or costs expended prior to our withdrawal or discharge, including time and costs expended to duplicate the file, turn over the file, and withdraw as counsel of record.

(c) Representation shall terminate upon completion of the legal matters for which you have hired the firm. In the event additional matters arise, a new fee Agreement shall be executed.

April 8, 2013

Patricia Y. Goodwin wife of Michael D. Goodwin

I, Patricia Y. Goodwin and my husband Michael D. Goodwin met at Attorney Bill Kelly's office in April 8, 2013 to discuss the plea. Attorney Kelly had mentioned that if Michael did not plead guilty I would go to jail along with Ms. Annette Hastings.

I was very upset that my husband was going to plea guilty because of me going to jail. I threaten to leave my husband if he plead guilty. I told him we had all the evidence and we could fight it. I begged him not plea guilty and I started screaming. At this point Attorney Kelly called Clark Holesinger and talk to him. When he hung-up the phone, he said Clark said "Plea guilty or Patty will go to jail."

Given the lack of counsel my husband felt he had no choice but to plea guilty in order to save me from serving time.

_(My signature)_

Subscribed and sworn to before me, a Notary Public in and for said County

And State this 2nd day of April 2014

Notary Public

Official Seal
ANNETTE PRUETT
Resident of Lake County, IN
My commission expires
July 6, 2015

County of residence Lake

My commission expires  07/06/2015

# VISION/MEDICAID

## ESTABLISH A PRACTICE THAT WILL SERVICE THE LESS FORTUNATE AND UNDERPRILIDGE

VISION: TO HELP THE LESS FORTUNATE

To establish an orthodontic office that would help the less fortunate with pride and dignity. We first purchased Osborn Orthodontic Practice in January 7, 2008. The office was far from average standards. In fact the practice would not pass OSHA or IPPA or Medicaid standards, from my perspective. Frustrated, I quickly saw the need to be **Effective** and using information technology to get a plan to provide Quality Care **Efficiently.**

This became even more apparent as the patient number grew and the physical structure had confined our ability to make the necessary changes. Knowing I only had 24 months to move out as the contract read, I exhausted s search to locate another building to renovate to meet my goals, not finding anything I decided to bite the bullet and in a bad economy, bought land and built the building to fit my vision for these children.

### Efficient Practice:

In the new office, one section is designated for photos and X-ray's. Using two digital X-rays we can see the results immediately on all the computers in the clinic. Each patient, after photos and X-rays, is placed in one of 5 or 6 dental chairs. After seeing the X-rays and examing the patient, I, with the assistance of an orthodontic assistant, fill out the necessary Medicaide paperwork and formulate a treatment plan. While the assistant finishes the paper work and writes it in the computer, I move to the next chair and repeat. Each assistant directs the examined patient to the next clinic section where they and parents hear what is going to happen next. That is oral hygiene instructions that are, both verbally and physically and any and all questions are answered.

Now that we have established the treatment plan, the clinical standard opportunity procedures kick in (see procedures).

### Effective Practices:

The above explanation of efficiency has allowed the finished orthodontic result to be just that, effective! For those patients who follow the instructions have a great result as indicated by the children, parents, referring dentist. Several of the referring dentists have verbally indicated we get great results as if they were private pay patients.

I received a call from Patty Goodwin on November 2008 to consider coming to Amarillo, TX to help her run her office. It was not until January 2009 I made a trip to Amarillo, TX during that visit I was in the office observing the front and back office. Within a few days of observing the office I sat down with Dr. Goodwin and Patty with my concerns about the office and I decided I would take the offer. But first I would have to go back to Colorado to make arrangements to come back to Texas by February 2009. When it came to February I came back to Texas and stayed at the Goodwin's house until April 2009 when I was able to move into my home. I did go back to Colorado in March 2009 to do some more packing. The following day of my arrival to Colorado I received a call from Lisa Backus head assistant/ front office stating that current office manager Kristen De Los Santos was in the office working on a patient that was from Oklahoma to my understanding. This Patient was treated without a doctor many times before Dr. Goodwin purchase the office. To our knowledge there were also three other patients that were treated without a doctor. The minute receiving the phone call I notified Dr. Goodwin's son, Dave Goodwin, to go to the office. I then proceeded to put Kristen De Los Santos on a conference call with Lisa Backus being my witness. I asked Kristen what she was doing with the patient knowing that there was no doctor in the office. She stated she was removing braces off of the patient and was going to impress her for retainers. She was immediately told that Dr. Goodwin was not in the office and no treatment could be performed without a Doctor present. This was instructed to her and the rest of the staff in a previous meeting. She was immediately terminated and asked to leave her office key at the office with Lisa. I then called Dr. Goodwin and Patty to let them know what was being done in their office while we were off rotation and he was out of town. I left to Amarillo as soon as possible. When I get into Amarillo I go to the office and I began searching in drawers and cabinets. I found multiple charts with just patients name but no photographs, x-rays, information package, or phone numbers. I also received patient names from Lisa Backus of family members of Kirsten De Los Santos that didn't have any charts but were being treated. I compiled all of the charts and planned a staff meeting as soon as Dr. Goodwin returned to the office in April 2009. Before the meeting I knew I was going to have issues with two other employees that were related to Kristen De los Santos and carried a prominent position in the office. They were Lisa Eason who was the front office manager and Sandy De Los Santos was head of scheduling. On April 1, 2009 before any employees went to work we changed the locks to the office due to the fact that all employees had a key. When everyone got to work we had our staff meeting and in that staff meeting all employees were told that Kristen De Los Santos was terminated and the reasons for her termination were that she was treating a patient without the doctor in the office. I stressed that that actions like these were not acceptable and if someone was evolved in these actions before that they would need to come forward and give information. By doing so your job would be secure but if I gained knowledge of your involvement in these actions you would be terminated immediately. Melinda K she came forward and admitted she was treating a family member. Later that month Patty Goodwin and I had a meeting discussing the need of purchasing two computers for strictly for billing. I proceed to call Medicaid and ask questions about the billing and I was also told that there were reports that were generated from Medicaid every Monday. After gaining this knowledge I asked Lisa Eason about the R& S reports and where they kept them. She proceeded to show me where they kept them in cabinets. After retrieving the reports they had concealed in the cabinets I asked her what all needed to be done with these reports. She stated they they were very few that had been posted and still had many to be posted. I asked her what she meant by being posted she responded that you have to get the charts and

put a red check mark after they've been paid. Concerned about this issue I called Medicaid and they went over about how to read the codes on claims that were denied and importance of the reports were to us. Especially since you only have up to one hundred twenty days to adjust a claim that was denied. I then realized we had multiple problems in our office and reported these problems to Dr. Goodwin and Patty Goodwin. Since multiple reports were never done a large of money was lost. While doing research on the many denials I called Clover who worked with Medicaid and she informed me that the reason for the denials on approximately 60 patients were due to the fact that retainers had been billed and paid. If retainers are billed and paid it means that braces were removed and retainers were placed and treatment was completed. I did research on these patients and discovered that these patients were still being treated and continued treatment for free. To my knowledge Lisa Eason was instructed to bill for the removal of braces and retainers with Dr. Osborn before these patients were authorized with Dr. Goodwin. We also were told that the other denials were from patients that were never transferred to Dr. Goodwin as a provider. Although no reimbursement from Medicaid would be given for treatment on these patients Dr. Goodwin still continued with treatment until patient was completed. After all this information I had a meeting with the Goodwin's letting them know that we needed to restructure the office staff. We began by removing bonus because of the lack of work not getting done and the disrespect they have with Patty Goodwin. After their bonus was removed Lisa Eason and Sandy De Los Santos requested to meet with me. At the meeting I had Patty Goodwin present. Bonuses, terminating their sister/sister in law, and policy and procedure changes were an issue at the meeting. During the meeting they walked out and proceeded to get their belonging and left the office to never return. Later that day Lisa Eason's husband went to the office to threaten us. Police Department was notified and a report was filed. New employees were hired and the reconstruction of the office was on its way. At that time the new office was being built and relocated to our new office on October 2009. When we opened our office in October we had Emily Singleton who is the Medicaid Representative for the Panhandle come visit our office. It was the first of only two visits anybody from Medicaid has made to our office.

Dr. Goodwin and Patty Goodwin purchased a new program that had the ability to do scheduling, accounting, treatment plan and much more. On December 18, 2009 appointments pro was no longer in use and everything was converted into the new program by January 5, 2010 our office started implementing Orthochart. On April 22, 2010 the attorney general officers came into the office with a list of charts and information that they needed to audit. They also interviewed employees, doctors and management. After doing research it came to our knowledge that there were procedures being done and billed that should have not been billed. We contacted and questioned some of the procedures. We never received an answer. I made a executive decision that impressions would no longer be done without a Doctor in the office. I was also not aware that only one adjustment could be billed in a month so we also made a change to that effect in our billing department. I then thought with information that had been provided to me that mistakes that were being made in our office were then corrected. I have continued to instruct my billing department to bill with the confidence that we our now in compliance. In May of 2011 one of my Billers Rachel Lozano who had been employed with our office since June 2009 presented me with a letter that she felt that our office had been conducting fraud since the beginning of her employment, however she continued to bill prior to that date and that was the first time she had brought that information to my attention.

*Ornette Hastings*



## Missing Note Book

1. I Annette took notes in February 2009.
   A. I used a small green note book to take notes each time I was in the office.
   B. Notes that were taken-
   1. Open procedures.
   2. Front office – turning on computers
   3. All about scheduling – making appointments, canceling appointments rescheduling patients. Writing down all information given from Sandy/Lissa
   4. All names of employees
   5. Phones numbers of employees/addresses
   6. Who are the persons next door to our practice.
   7. About how many patients do we see each day.
   8. Asking about each of their responsibilities.
   9. Closing- who closes the office, and sees that everything gets shut down at the end of the day.
   10. Who has keys to the office.
   11. Asking what happens when emergency patients call – how are they scheduled.
   12. How long has the Assist's been assisting.
   13. I asked how long has Sandy/ Lissa  worked the front office.
   14. Who can we call for help with MCD. I want all names and want to set time to meet with MCD people.
   15. Had Lissa  show me how she bills MCD what procedures does she do when she bills. I wrote everything down and drew a picture of the screen where all the information would need to be enter. And how at the end of the day this information {the batch} as she called it would then be submitted to MCD.
   16. The computer that was used for Insurance/MCD had many posted notes taped to the computer. procedure codes so when she billed she had codes in front of her at all times.

17. Codes were very important to put in the computer she said.
18. I needed to know more about these coded I said to her. She explained and I took notes.
19. R&S Reports were very important- had her show me how to read them and what was important she did not give me much information on them.
20. I asked why so many R&S Report were not done?
21. I notice no count ability on the work that needed to be done in the front office. Looking at the charts I wrote many notes concerns that I saw during my notation.
22. I had notes to go back on at any time.  I would need them.
23. During the period of the Lissa and Sandy walking out I needed my notes. My notes would be able to get me thur the next few days.
24. The new staff help me look for my note book we could not find it any where. I had no proof did Sandy /Lissa take my note book or hide it where I would not be able to fine till later.
25. My note book was never found.
26. Back Assists had to help my new front office including myself.

*[signature]*   10-14-11

On Oct 12th 2012, Patty Goodwin called me, she was having chest pains and needed to go to the hospital. When I arrived she was very distraught and had to be helped to my car. Then her daughter Michelle arrived and took Patty, I followed to the hospital. I've been a friend for over 30 years and I've never seen Patty more upset. She made it clear to me that more than anything she just needed to tell her story. So I stayed with her until late that afternoon and just listened. Whenever I had talked with Patty prior to the day in the hospital, she would tell me that she was advised by her lawyer not to talk with anyone. She had worked long and hard to document all the events leading to her husband being charged and she was denied her right to speak out. She had been isolated from her friends and family unable to tell her side of the story to anyone and it took a terrible emotional and physical toll on her.

I would be willing to testify to any of the events relating to my witness.

Rosemary De St. Jean
notary,
expire 3-17-17
Lake County, IN

Truthfully

Elayne B. Sojourn

GOODWIN'S TIME LINE

Page1

## June 2007

In June, Lisa Backus, who had worked in Colorado with Dr. Goodwin, called to inform Dr. Goodwin that Dr. Osborn, where Lisa Backus worked in Amarillo, was ill and wanted to sell his (Dr. Osborn practice and also needed help. Mrs. Osborn began to leave messages on Dr. Goodwin's home phone. After several messages, Patty Goodwin returned the call. At the end of July beginning of August we decided to visit the Osborn.

## August 2007

Patty and Mike visited the Amarillo office on a working day.

Dr. Osborn asked Dr. Goodwin if he (Dr. Goodwin) would help. That very same day Dr. Goodwin observed the practice and Mrs. Goodwin assisted in the sterilization.
Dr. Osborn was very ill Dr. Goodwin observed and found the orthodontic assistant's doing everything regarding orthodontic treatment on the patients.
Dr. Osborn was having a hard time walking

Dr. & Mrs. Osborn explain the practice as to operation.

Mrs. Goodwin expresses skepticism regarding the practice. Patty expressed that feeling to Dr. Goodwin

## September 2007

**Dr. Osborn is using a cane to get around not able to walk adequately**

**Dr. Goodwin applied for the Texas Dental License.**

Patty's skepticism was regarding HIPA, OSHA, the amount of patients being seen in a very small confined area and no knowledge about Medicaid. The office was not in compliance with the Dental State Board. Patty notice there was no accountability regarding patients Medicaid accounts. NO Ledger on patients.

At the end of the day Patty and Mike met at the Osborn's house.

Dr. Goodwin expressed these concerns on the treatment of the patients, such as: poor bracket placement, the extraction pattern (removal of cupids vs. bicuspids) the poor oral hygiene of the 80% of the patients, the lack of finish x-rays to check root position, broken appliances (Brackets) etc. Dr. Osborn's response was that Medicaid patients have such a poor Dental I.Q. it was hard to get compliance from them on these things. That I could practice anyway I saw fit when it was my office.

Dr. Osborn paid Dr. Goodwin $2, 00.00 a day for the work done in August.

Mrs. Osborn asked Mike to buy the practice.

The Goodwin said that they would consider the idea.

**Dr. & Mrs. Goodwin met with Chase Bank for the loan for the purchase of the practice**

*ENCLOSURE 10*

Page 2

Mrs. Osborn called and asked if Dr. Goodwin could come over to help with the patients. Mrs. Osborn would compensate Mike for helping with the patients. Dr. Bill Osborn, his son would act as Dr. on premises. His office is adjacent to the office.

Mike and Patty lease a home with intent to buy if the practice purchase went through

Dr. Goodwin and Mrs. Goodwin did agree to the offer.

**September 26, 2007**

**TEXAS LICENSE ISSUE**

Dr. Osborn compensated Dr. Goodwin $2, 00.00 a day for seeing patients as review

Dr. Osborn was at home while Dr. Goodwin was at the office.

**October 31, 2007**

**Dr. Osborn is using a walker and is not looking very well.**

**The Certificate of Formation for Goodwin Orthodontic PLLC with Brown & Fortunato P.C.**

Mrs. Osborn asked if we (Mike & Patty) made any decision on purchasing the business. Patty said she needed to see financial statements.

Mike & Patty received the financial statements the first week of October.

Dr. & Mrs. Goodwin gave financial statements to Ingrid Huffine @Joe Mihalov, CPA, firm for review

T the accountant's reaction to the financial statement was positive.

The accountants requested that Dr. & Mrs. Goodwin get the Tax returns for Dr. Osborn's practice

The accountants received a review the tax returns. The Goodwins met with Joe Mihalov, CPA to discuss purchasing practice.

Dr. & Mrs. Goodwin received a letter from Mrs. Osborn stating the asking price for the practice $1.45 million

Dr. & Mrs. Goodwin started the loan process with Chase Bank to buy the practice

**November 11, 2007**

**Dr. Goodwin applied for Medical Enrollment. This was very time consuming.**

Page 3

**November 16, 2007**

**Dr. Osborn is using a wheel chair.** We have to help Mrs. Osborn to take them out to dinner.

**TEXAS COMPTROLLER OF PUCLIC ACCOUNTS WAS CERTIFIED**

Dr. Osborn continued to compensate Dr. Goodwin $2,000.00 a day for reviewing patients.

**December 2007**

**Dr. Osborn was at a nursing home while Dr. Goodwin covered Dr. Osborn's practice.**

At the end of the day Mike & Patty would at the Osborn's nursing home.

**Bank Loan was approved.**

The lease of the office space was provided to us by Mrs. Osborn for a one year term.  **IMPOSSIBLE!!**

**2008**

**January 7, 2008**

**CLOSE THE LOAN.  BILL OF SALE OF T HE PRACTI $1.45 MILLION**

**INHERITED FROM THE PRACTICE:**

**1477 ACTIVE PATIENTS**
**NINE (9) STAFF**
**SCHEDULING PROGRAM**
**VISTA DENT**
**NO ACCOUNTING PROGRAM/NO LEDGERS FOR MEDICAID PATIENTS' ACCOUNTING**

Medicaid checks were going into Dr. Osborn's bank acct. because Dr. Goodwin was going thru the process of Medicaid enrollment.

At closing, Mrs. Osborn gave Dr. **Goodwin A ONE YEAR LEASE JAN-DEC 2008**

Page 4

# EIGHT (8) MAJOR ISSUES THAT NEEDED TO BE ADDRESS IMMEDIATELY

## January 8, 2008

When the business was acquired the following were issues that needed to be addressed in order to comply and not violate each entity in order to continue operations and maintain a high level of compliance.

Scope of <u>VIOLATIONS</u> of the practice upon possession of the company: (**Note**: the importance is not necessary in order. **Each is and was top priority**)

## We were in Amarillo 10 to 12 days to solve and address issues

1. HIPPA          4. OFFICE SPACE     7. ACCOUNTING BOOKEEPING
2. OSHA           5. PARKING          8. LEASE
3. MEDICAID       6. STAFF            9. SOLUTION

1. HIPPA

- Patients' charts and insurance information were in full view of other patients. The health information of patients were in full view of other patients.
- Patients' personal information was simply disposed being tossed in the garbage
- Employee (Lissa Eason) took charts out of the office. Employee was submitting patient Medicaid claims through her home computer.
- There was no way in securing the patients information in a safe place
- Found patients charts that had braces without proper information and documentation
- No accounting or patient ledger for Medicaid patients

Unbeknown to Dr. Goodwin the practice he purchased had been committing Medicaid fraud. The practice was also in violation of HIPPA, OSHA and IRS regulations as evidence by the letter presented to us at closing on January 7, 2008 by Dr. and Mrs. Osborn.

When Dr. Goodwin started the practice on January 7, 2008 he realized 8 out of 10 patients had serious orthodontic and oral hygiene problems. Dr. Osborn would extract cuspids and not the traditional bicuspid in his extraction treatment, which complicated treatment finishing. The staff would remove the braces then remove the glue with FINISHING BURS WHICH ALSO REMOVES TOOTH ENAMAL. Patients were far from finished then removing the braces; example 75%-80% of the patients the brackets and wires were position incorrectly (upper brackets placed on the bottom teeth and lower brackets placed on the upper teeth). Wires were used for wrong treatment plan. This type of work indicates strongly that it was not performed by a professional orthodontist.

On March 6, 2009 Lisa Backus, an orthodontic assistant, reported to Ms. Annette Hastings, our newly hired office manager, that Lisa Eason, Medicaid billing manager, was taking Medicaid patients charts home and submitting Medicaid claims from her home computer. This is against HIPPA regulations.

Lissa Eason, Kristin De Los Santos, and Sandy De Los Santos came to Dr. Goodwin's office and offer to fill the HDL forms since they did it for Dr. Osborn and they never got rejected. Dr. Goodwin said that from now he will fill out the HDL forms

Page 5

SOLUTION:  FOUND A GOOD COMPUTER TECHNICIAN
1. Needed to remove the insurance information from patients view immediately
2. Found a company to pick-up confidential information to be shredded
3. Put a stop of charts being remove from the office
4. Tried to get the Off. Manager (Kristin De Los Santos) to tell me who were the patients that were being done for free so they would be documented properly

2. OSHA
- The brushing area consisted in a room with a sink and a toilet next to each other
- The sink was unsanitary with blood and saliva constantly floating in the sink
- The carpet in the brushing area had a horrible smell of urine
- The staff ate and kept food in the room where the X-ray machine was
- The staff kept the dental chemicals in the refrigerator (2x3) next to their food where contamination was possible
- The staff would wear open toe sandals to work

3. MEDICAID

**Probably my biggest concern, however, we were told by Dr. & Mrs. Osborn the staff knew everything we needed to know about working with Medicaid. They had been doing this for years and never had any trouble. Then when Ms. Emily Single, Medicaid Representative, came in and confirmed that they knew how to deal with Medicaid, I felt we had time for them to teach us how to handle Medicaid because Dr. Osborn was too ill. After all they never had a problem with Medicaid. I realize we had big issue when the time I had to fill out the Medicaid forms, Kristin De Los Santos, Lissa Eason, and Sandy De los Santos were in the room and said they could fill out the forms and send them to Medicaid for me because they did it for Dr. Osborn for a long time and were never rejected. I confirmed we were going to do it by the book and I WOULD FILL THEM OUT.**

4. OFFICE SIZE SPACE

I was amazed at all the patients being seen in such a small space.  The clinic consisted of 1,500 sq.ft. to have a waiting room, appointment area, billing area, back office, front desk area, clinic, x-ray room, lab, sterilization area, storage room plus dark room and two bathrooms.  The on deck area was along the hall way too small to be efficient and effective to deliver services with out coax! Approximately 100 patients were schedule with only 5 orthodontic assistants.

5. PARKING

When your office is part of a rental complex, parking can be a problem and this was worse.  The first time I met Dr. Bill Osborn, son of Dr. Charles Osborn the second phrase out of his mouth was "We have a parking problem". I said I had hoped that would have been solved before I got here.  I had no idea on the solution.  He wanted us to maximize the patient load on days he was not in the office, but that was only one day.  So we did the retie day at that time.  This did not help all the days.  This finally got so bad the Insurance Company across the way started having the patient's cars towed at $100.00/car, this was devastating.

6. STAFF "COMPLACENT"  (Unaware of possible danger)

I was very concerned about the staff we had inherited.  The 3 most key positions in the office were controlled by family, Kristin De Los Santos was the office manager, her sister Lissa Eason was in charge of billing everything to Medicaid and later found out she took charts and submitted at home in her computer.  Sandy De Los Santos was the sister-in-law to Kristin and in charge of the scheduling.  This was our biggest concern; however, they had also hired all their friends to work in the office.  Our fears came true when we finally had an issue with Kristin.  The whole office blew up and here we are today.  The staff was use to doing things their way for along time with supervision and were very resistant to change or improvements.  **Very complacent!** The whole staff had keys to the office.

Page 6

## 7. ACCOUNTABILITY / BOOKEEPING

There was "NO" accountability. There was no accounting program, no spread sheet and no patient ledger on what was filed to Medicaid. There would be no record on what was filed to Medicaid. There would be no record at all if the treatment had not been recorded in the chart. Medicaid had record of what was filed for but we DID NOT. We were at their mercy of what ever Medicaid responded to. When Medicaid would send the insurance report list Lissa Eason would place a red check "( )" mark to indicate the procedure was paid for on the charts. That is it! Most charts had handwriting you could not read. You could not tell if the check mark was accurate or just done to make it look as if they were doing their job. This had to change, we could NOT rely on just Medicaid accounting because so many denials were never processed and never paid for, what else were they not doing.

## 8. LEASE

Nothing like buying a new practice with so many problems and finding out the sellers wanted you to buy the building or get our in one year. Patty and I had to fight to get more time. We finally got Dr. Osborn to agree to a one (only one) year extension. This put a lot of pressure to find another office space with ample parking. We found the perfect location for the clinic. In a poor economy we needed funding. We had just borrowed $1.45 million for the practice. With "no collateral" we had to hope the bank would go along with funding a new office with "no collateral". We had to hope the bank would go along with funding a new office. We borrowed $1.250 million for the building and borrowed another $275,000.00 for the land. I stuck my neck out for approximately 3 million dollars to help solve these issues. Not to fraud the government

## SOLUTIONS:

### FIND A FULL TIME OFFICE MANAGER

### BUILD A NEW CLINIC

The Goodwins immediately started to look for office space. This would address HIPPA, and OSHA. Mrs. Osborn advised us to keep the current staff since the knew the rules regarding Medicaid (No.1, 2, 5 & 6)

Kristin De Los Santos, officer manager, prepared schedule Jan, Feb, & March. Patty tells Kristin De Los Santos to schedule a meeting with Medicaid representative, Mrs. Emily Singleton.

STAFF: 3 PEOPLE WHO WERE RELATED HAD CRITICAL POSITIONS IN THE OFFICE, SUCH AS:

**Kristin De Los Santos, Office Manager/ orthodontic assistant.** She was caught removing braces from a patient with out a Dr. present.

**Lissa Eason, Manager of Medicaid billing,** sister to Kristen De Los Santos. She took patients charts out of the office and submitting them at home computer to Medicaid

**Sandy De Los Santos, in charge of scheduling,** is sister-law- to Kristin De Los Santos

### January 12, 2008

**Lissa Eason, Kristin De Los Santos, and Sandy De Los Santos came to Dr. Goodwin's office and offer to fill the HDL forms since they did it for Dr. Osborn and they never got rejected. Dr. Goodwin said that from now he will fill out the HDL forms.**

Page 7

Patty went to the office on Sat. & Sun. (1st weekend after closing) and did a thorough cleaning.

Patty asked Kristin De Los Santos for charts of any patients that were pro bone. Kristen got flustered and said "Yes Ma'am"

Mrs. Goodwin started to look for an office Manager. Mrs. Goodwin knew she needed a full time manager.

**January 17, 2008**

**Dr. Goodwin receives his KINTANA NUMBER # 3329112**

**February 2008**

Dr. & Mrs. Goodwin arranged scheduling between the two offices, Texas and Indiana.

Mike & Patty inherited the original staff from Dr. Osborn and started working and learning from them.
Kristin De Los Santos did the hiring and the firing, set the scheduling of patients and also did orthodontic assistant duties.
Staff responsibilities see employee below.

The scheduling was made three to four months ahead.

Mrs. Goodwin arranged scheduling in Indiana to fit Texas office schedule.

**PATTY REALIZED A SERIOUS ISSUE WITH BILLING TO MEDICAID. LISSA EASON WAS TAKING FILES HOME AND WORKING ON HER HOME COMPUTER BILLING MEDICAID**

**February 27, 2008**

**CLOSED ON THE LAND. IMMEDIATELY FOLLOWING THE PURCHASE OF THE LAND THE CONSTRUCTION LOAN PROCESS STARTED WITH CHASE BANK.**

Patty mentioned to Kristin to arrange a meeting Ms. Singleton, Medicaid representative.

**February 2008**

Still Dr. Osborn received Medicaid checks for Services provided by Dr. Goodwin

**Dr. Goodwin is noticing a serious issue with the bracket placement. The orthodontic treatment on patients is work that was not supervised by an orthodontist. Wrong wires were being used and brackets were positioned incorrect. Dr. Goodwin is noticing SERIOUS PROBLEM with Orthodontic treatment on the patients.**

Employee    **Kristin De Los Santos**-Office Manager/Ortho Assist. /Treatment Coordinator. Kristin did the hiring and firing with Patty's approval. Patty found files in Kristin's desk drawer of patients being treated by someone else other than Dr. Goodwin. No documentation on these patients anywhere in the office. Kristin had key to the office. Per HIPPA law, all patients need to be documented. Kristin made the office work environment for Seana and Briana Rodgers miserable. The tension was horrible between Briana and Kristin. Kristin sold candles at the office and her product was being delivered at the office

Page 8

Employee   **Briana Rodger** Ortho/Asst./Lab/e Tech. Briana got very upset with the fact that Mike and Patty were going tot add a full time lab tech to the firm. Briana used profanity in the office towards Kristin regarding the lab.

Employee   **Lissa Eason**/Sister to Kristin De Los Santos/Medicaid Billing Manager. Per Lisa Backus, Lissa Eason took patients insurance charts home and worked on them at her home computer. When Patty found out about this practice, Patty held a staff meeting and told everyone" Under no circumstance do files leave this office" This practice continue without my knowledge when we would be out of town. Lissa Eason was hygienist and had key to the office.

Employee   **Sandy De Los Santos** – sister-in-law to Kristin De Los Santos. Sandy's job was to do the scheduling of patients. Sandy also had a key to the office.

Employee   **Lisa Backus**-Orthodontic Asst. /Clean office/helped with scheduling /insurance. Lisa Backus called Dr. Goodwin about Dr. Osborn's practice being put for sale. Lisa had key to the office. When Lisa did not get a bonus she got very upset with Patty and told Patty "go to hell" This happened approx. 2010.

Employee   Cristal Denbow also worked for Dr. Bill Osborn (Dr. Charles Osborn's son) whose office was connected to our office, from his lab into our operatory. Dr. Bill Osborn controlled the lock. Cristal was orthodontic assistant and front desk for Dr. Bill Osborn and they were using the Ortho Chart program in his office. Cristal was familiar with OrthoChart. Cristal quit when Patty found out she had gotten into the security system in Orthodchart by getting the pass word from Dr. Orthodchart without Patty's permission. Cristal would not sign papers regarding this incident. OrthoChart documented this incident on their invoice.. This is how Patty found out about the Security breach. She quit approx. 2010.

Employee   Melinda **Kirkeeng**- sterilization and later Ortho Assistant and sometimes helped in the front clerical office. Later quit because of friends with the 3 related sisters.

Employee   **Tammy Navarette**/OrthoAsst.had little to no knowledge about orthodontic assisting.

**March 2008**

Kristin De Los Santos prepared scheduling through June 2008

Still Dr. Osborn getting Medicaid checks for services performed by Dr. Goodwin. Dr. Goodwin still did not have his TP# from TMHP.
Asked Office Manager Kristin De Los Santos, if there were any patients being treated for free. No answer. Asked again two to three months later, still no answer.

**March 6, 2009**

Lisa Backus, an orthodontic assistant, reported to Ms. Annette Hastings, our newly hired office manager, that Lisa Eason, Medicaid billing manager, was taking Medicaid patients charts home and submitting Medicaid claims from her home computer.
This is against HIPPA regulations.

**March 2008**

**During this month Cristal Denbow offers Dr. Goodwin money from the daily cash receipts. Dr. Goodwin told her all money, cash included needs to be put into the daily deposit. Ms. Singleton from Medicaid comes for the first time inspected and brings coffee mugs and pencils mentions to Dr. Goodwin she has no time to speak with him.**

**March 1, 2008** First Medicaid check was deposited in Dr. Goodwin's account. He now had his own TP#

Page 9

Patty is still looking for a full time office manager that Patty can trust.

Goodwin Orthodontics was having issues with the small parking lot. Many patient's cars and employee relative's cars were towed away by the next door tenant (Farmers Insurance.) This was an ongoing issue with the other tenant. This happened on numerous occasions.
As Mrs. Godwin started implementing changes in the office procedures, there was resistance to change by the inherited staff.

Sometime in the spring, Mrs. Godwin started working with Chase to get a construction loan for a new building on the land they purchased in Feb. 2008.

**May 2008**

Mike & Patty started looking for a new building. Had to do extensive research, since they did not know the local community.
On going problem.

Still looking for a full time office manager that Patty can trust. Patty notices the staff wearing open toe shoes to the office. Had a meeting regarding the danger wearing those shoes and did not them wearing them.
**Notice that Lisa Backus ignore my warning of the open toe shoes.**

Mrs. Goodwin asked Kristin to set an appointment with Medicaid's Rep. Mrs. Singleton. Initial appointment was made for a day Mrs. Goodwin was in Indiana. Mrs. Goodwin told Kristin to reschedule to a day she would be in Texas. This was the first time Kristin raided her voice to Mrs. Goodwin and argued with her because I had her change the appointment so Patty could be in Amarillo. Patty notices that Kristin is selling candles at the office and her product was being delivered at the office taking space in already crowed area.
**Kristin prepared schedule for July, Aug. and Sept.**

**June 1, 2008**

**Lissa Eason offers Dr. Goodwin cash from the daily cash receipts. Patty Goodwin happens to be present and tells her "NO" the money needs to be accounted for and put on daily deposit. I knew we had a serious issue with cash flow. We had no accounting ledgers for patients paying cash. Patty went to the Office Max and purchase spreadsheet and had the girls implement this temporarily.**

**Ms. Singleton did not call back for two to three months. When she finally came, (Dr. Goodwin showed Ms. Singleton the seriousness of patients with poor oral hygiene the poor position of brackets. After showing her some patients Dr. Goodwin asked Mrs. Singleton if he could charge for repositioning poorly positioned brackets and removing wires to solve the severity gum infection. She gave us the approval to do both, reposition brackets and wire removal. Present were Kristin, Lissa Eason, Patty Goodwin and Dr. Goodwin.**

**June 2008**

Again Patty asked Kristin for charts or "Tell me who the freebies are". Again she answers "Yes Ma'am"

**September 2008**

**Purchased home at 6102 Glenwood Dr.**

**Sometime in the fall, Ms. Singleton came into our office. General discussion about patients. Mrs. Goodwin asked about seminars being held by Medicaid, which Patty could attend. Some were coming up on or about March 2009 in Lubbock.**

Page 10

Still looking for a full time office manager that Patty can trust and still evaluating staff.

Kristin prepared schedule for **October, November, and December.**

Employees were beginning to ask about their annual paid trip for Christmas. Mrs. Goodwin asked her accountant, Ingrid Huffine about this practice. Patty was told that she were to give them trips, that the amount of the trip had to be added to the **employee's W-2. Staff was NOT happy.**

Got commitment from Annette Hastings to come and evaluate our office for the office manager position. Annette would travel to Amarillo in Feb. 2009.

**December 29, 2008**

**Mike & Patty closed on construction loan with Chase Bank.**

Requested an extension on the current lease to the end of December 31, 2009 from Mrs. Osborn

Kristin prepared schedule for Jan Feb. March 19, 2009

**2009**

January 15, 2009

**FIRST DRAW FOR THE CONSTRUCTION**

Patty's time is consumed by construction needs.

**February 29, 2009**

Annette Hastings came to Amarillo and stayed with the Goodwins to look at office manager position. Patty told Annette about the changes that needed to be done at the office and issues of great concern.

Annette came to the office for three days. After the 2nd day, Annette told Patty about the HIPPA and OSHA rules that were in violation of and needed to be addressed immediately.

Patty tells Annette she needs to live, breathe, and eat Medicaid first. Learn as much as you can, as fast as you can. Told Annette to contact Ms. Emily Singleton the TMHP representative

**March 1, 2009**

**Annette came to work as office manager. Annette had a staff meeting to let everyone know she is the new office manager.**

Kristin prepares schedule for April, May & June

Purchase 5 new computers to address HIPPA issue and segregate the insurance department form the front office.

Page 11

**March 19, 2009**

**Annette discovered Kristin De Los Santos removing braces from Misty Tyler (a friend of Kristin) without a Dr. in the office. Therefore Annette fired Kristin. Annette had a meeting regarding seeing patients without a doctor.**

**On March 31, 2009, Lisa Eason and Sandy De Los Santos arrived at the office and were highly confrontational.** They demanded a meeting. A meeting quickly took place with them, Ms. Hastings, and Mrs. Goodwin. In the meeting Ms. Eason and Sandy De Los Santos were highly confrontational and disrespectful. They accused Mrs. Goodwin of merely training Ms Hastings in order to fire Ms Eason. Ms. Eason then asked if Mrs. Goodwin was firing them. The response was negatively because they had not done anything that warranted termination. Then Ms Eason announced that she and Sandy De Los Santos were walking out and they immediately left the office. **Later that we learned that upon arrival that morning, Ms. Eason had informed another employee, Tammy Naverette, that she and Sandy De Los Santos intended to resign.** In the late morning, Ms. Eason's husband, Scott Eason, came into the office. He demanded to know why his wife had been fired and was informed that she had not, but had resigned. Mr. Eason became belligerent, loud, and used obscenities in front of the children and parents. We called the police. They came to the office. A Police Report was filed stating that Mr. Eason had used profanity in front of children and parents and that he threatened Ms. Hastings. Witness to this incident were three new employees (Melissa Quintero, Rebecca Muligan, and Lissa Hernandez)

Later that afternoon Kristin De Los Santos and Sandy De Los Santos's husbands, Chico and Isaac, came into the office and demanded a meeting with Dr. Goodwin. Isaac De Los Santos demanded to know why his wife had been fired. Dr. Goodwin expressed to Mr. Isaac De Los Santos that she was not fired but chose to walk out. In order to cool things down, Dr. Goodwin stated that possibly they could be re-hired the next day. **That evening Ms. Hastings started pulling charts for the next day. She discovered that all patients' chart records had been sabotaged and were completely mixed up, apparently deliberately. Had this not been discovered, misdiagnosis of patients' procedure could have happened. We also found out that some patients' schedules had been tampered with.** Some patients were schedule on the wrong day for certain procedures. **Others were scheduled and not entered into the computer so the office would not be expecting them for treatment. The next day Mr. Isaac De Los Santos asked if his wife would be re-hired.** He was informed that, given what had been discovered the prior evening regarding the charts and the scheduling, her resignation would stand. He then asked if she would receive a bonus and was given a negative answer. Mr. Isaac De Los Santos then threatened that in 20 minutes he could have people picketing outside the office and said," I am **Union Negotiator at Pantex and I will use all of my resources to get back at you for not hiring back my wife"**.

**On March 31, 2009 Kristin De Los Santos' mother came to our office and delivered enclosed letter from Joan Osborn (which was curiously dated May 15, 2009) seemingly giving permission for Kristin De Los Santos to remove the braces off Kristi Tyler. (See Enclosure 2). We feel that neither Dr. Osborn nor Mrs. Osborn had authority to approve any treatment having completed the sale of the practice to Dr. Goodwin on January 7, 2008. Moreover, in our view Mrs. Osborn who is not a license orthodontist would not have the ability to prescribe any treatment for any patient at any time.**

**March 2009**

Cristal Denbow, in passing mentioned to Annette she was thinking of looking for another job.

Patty and Annette had a meeting to talk about staff needs. Discussed possibly making an offer to Cristal, since she had mentioned to Annette a desire to look for another job. Cristal came and worked for Goodwin Orthodontic PLLC. Cristal knew how to do the patient appointments and insurance and had used OrthoChar program. Ms. Annette changes locks in the office.

From April to end of September Mrs. Goodwin worked on the construction and completion of the new building, i.e., all dental chairs, design, electronic system, every aspect of the new building was handle by Patty. This was done to be more efficient and effective to better serving of the patients. Also to meet HIPPA & OSHA standards.

Page 12

**May 2009**

Goodwin Orthodontics Purchased 11 user licenses of OrthoChart

**June 2009**

Started inputing into OrthoChart patient information only.  Transition to new computer system was not smooth

Patty had reupholstered 19 waiting room chairs and three dental chairs.

All through the summer months started slowly packing office for move to new office.  Annette focused on the move; Patty managed all aspects of the construction of the building.
Mike and Patty are under a lot of stress because their lease is coming up in Dec and Mrs. Osborn reminded them about it.

**September 9, 2009**

Dental stations came in wrong.  Had to have them redone before opening on the 14th of September (thurs, Fri, Sat & Sun to get counter tops made!)

Patty got them done with the help of prayers and the man who came thru for us.

We have 5 separate departments in the new office: Front Desk, Insurance, Operatory, Lab and Sterilization.  Ms. Annette asked the employees if they wanted to participate in the move on Friday & Sat. Most showed up to help with the move.

Computers were moved and installed form old office

**September 25, 2009**

OrthoChart, VistaDent and appt. pro were configuring to work stations to access all three data bases.

**September 25, 2009**

Configure dental chair computers with all three data bases

**September 28, 2009**

Configure all three printers with front office and file room computers.

**October 2, 2009**

Emily Singleton, Medicaid Rep. came to our new office.

Page 13

**October 2, 3, 4, 6, 12, 17, 28**

Annette & Dr. Goodwin's computers were installed
Installed time clock
Installed digital x-rays
Prepped dental chair computer
Set up TV monitors for dental chairs
Troubleshoot
Installed sound connection between monitors and dental chairs computers
Install Dr. Goodwin's printer
Training & support time clock program
Install monitor in Dr. Goodwin's office
Install security camera software

**November 20, 2009**

Integrated digital x-ray and photos with OrthoChart.  Start setup of OrthoChart Scheduling.

**December 4, 2009**

Actually started using OrthoChart to post patient ledger and patient charts and scheduling.  Annette felt she needed to still document on both the computer and hand written system until Annette was confident of the computer system.

**December 16, & 17th**

Dr. & Mrs. Goodwin leave to Indiana for the holidays.
Dr. Baron fills in for Dr. Goodwin- no check was issue for this day.  Dr. Baron's granddaughter's care was trade off for day worked.

**Closed office until January 4, 2010**

**January 1, 2010**

All computerized systems are online.  Working on some glitches with the program with transition.
All employees are now in computer time clock program.

Faxed Desiree Banda @ Community Options, Inc. info request.  (Community Options is part of Medicaid.)  Patty spoke with Desiree Banda regarding Community Options and asked about how they related to Medicaid.

**February 10, 2010**

Rachel Lozano was hired in the insurance department

## Page 14

**Major problem: Vapor is coming from the vase of the dental chair where all the electrical wires are. Patty tells Annette not to have anyone sit there. Patty called Mr. Matel, the contractor. He mentions that water should not have been run thru there. He could not understand why it happened. Plumber came and the problem was fixed.**

### April 9, 2010

Uploaded programs to a new 2nd digital X-ray machine.

April 22, 2010

**Sam Martin, CPA and Marc White, FBI came into office with a letter from the Office of the Attorney General. Greg Abbott requesting data. This happened on one of the busiest days in our office. Full staff in the office, front office 7 employees, operatory 10 orthodontic assistants, lab 1 and sterilization 1 employee**

Dr. Baron had a morning doctor's appointment but told Annette he would be in the office on time. However he was an hour late arriving and could not contact Annette to let her know he was running late. Appointment took longer than expected.

Annette called Patty and informed Patty of the 2 investigators in the front office. Patty asked Annette to get identification and business cards and told her not to release anything until Patty called her back. Patty needed to confirm their order. Patty called Medicaid and was informed that they are Medicaid investigators. Patty immediately told Annette to assist with them whatever information they requested. Make copies of everything given to the investigators. At this time Annette expressed that this was "one of the busiest" times in the office. Patty told Annette to do the best she can. T he investigators presented a list of 80 patients charts for them to take. They were given t he handwritten charts. With all the turmoil in the office, Annette did not add the computer charts to their request. Per Annette, the investigators interview Dr. Baron, Annette, and eight employees (Seana Goodwin, Rachel Lozano, Tara Lynch, Brea Rodgers, Melissa Romero, Lori Sanasikone, Dustin Vega, and Tammy Navarette

After the questioning by the investigators, Annette did research regarding questions t he investigators has asked her about certain billing procedures, i.e. impressions without a doctor and multiple adjustments billing. Annette called Medicaid and never received an answer to her questions t hat the investigators raised. Based upon her conversation with the investigators, Annette made an executive decision that impressions would no longer be done without a doctor in the office and only 1 adjustment would be billed per month.

## POINTS TO BE REVIEW BY DR. GOODWIN'S CONVERSATION WITH MR. SAM WHITE AND FBI MARC WHITE ON APRIL 22, 2010

Money Paid to Dr. Baron

1.

I was paid by 1099 form July 2007 until December of 2007.

2.

All the other Doctors working for Dr. Osborn were paid by 1099, Dr. Algers, Dr. Brown and two other

3.

When I hired Dr. Baron I asked the Medicaid field representative, Ms. Emily Singleton if Dr. Baron could be paid by using a 1099 as he would only work 1-3 days per month. Ms. Singleton said he is so part time a 1099 would be fine.

4.

We asked Medicaid on many occasions to review our policies.  They refused, so, we continued paying 1099.  Thinking we had approval from Ms. Singleton.

Page 15

5.

**When the Feds came in to the office on April 22, 2010 Mr. Sam Martin, CPA and Marc White, FBI told us it was fraud to pay Dr. Baron with a 1099 form;**

- We immediately filed for group application.
- This process required for Dr. Baron to move his TPI #157232302 from Lab Tech to Goodwin Orthodontics PLLC and the process took months.
- A **Q 6 number was given as a Temporary number**
- **In October of 2010** we received first response for the group application
- **Major issue was extension of time to answer their change request**
- **October 22, 2010** we received the group application. **Kintana #4050836**
- Made changes and sent it back to TMHP Ticket #731730404
- In November of 2010 received some more changes. Ingrid calls TMHP Ticket #731732470
- Ingrid called **Jordan Ticket #731735583** and Jordan told Ingrid that a group application was not needed for subcontracted doctors and we should cancel group application.
- Ingrid and Patty fax a letter requesting cancellation of Kintana #4050836.
- Ingrid called **Isabella Ortiz 512-506-7478** and was told that we needed a group application and all subcontract doctors had to be included in the group application.
- Ingrid called TMHP and spoke to **Phoebe Ticket #731734155** and asked her to remove our letter requesting cancellation of group application. **Phoebe assured** us the letter was removed.
- Since we received subsequent correspondence form Medicaid dated November 19th our Kintana **# 4050836 was still active.**
- In November 30, 2010 received another request changes to TMHP. All they needed was an EFT Notification form. This had to be signed and mailed.
- December 27th 2010 sent signed EFT form with letter to TMHP.
- February 4, 2011 received letter from TMHP denying group application request due to on going investigation.
- Sent letter regarding denial and requesting a formal appeal of that denial.
- Dr. Olesen received a letter from TMHP giving a final decision on his group application.
- They denied his application
- Dr. Baron never received a letter of denial

6.  **We should have been allowed "Due Process" to make these changes.**

**May 1, 2010**

Ingrid Huffine came to work for Goodwin Orthodontics PLLC as accountant

**June 10, 2010**

Emily Singleton, Medicaid rep. came to our office, after Annette called her to clarify some questions that the AG investigators had asked Annette. At the meeting with

Ms. Singleton, Denise Duran, Rachel Lozano, Annette and Patty Goodwin were present. Denise took notes of the meeting. See Enclosure  (   )

Annette, Denise and Rachel went to a Medicaid Seminar in Lubbock. At the seminar Annette learned that Goodwin Orthodontics PLLC needed to be a group provider.

Page 16

## October 10, 2010

Prepared group application. Requested Dr. Baron give us a letter moving his TO#157232302 from Tec Tec Lab to Goodwin Orthodontics PLLC. Received such letter

Received our 1st response to our group application requesting corrections to our application and giving us a Kintana #4050836. Made changes and sent back to TMHP

## November 19, 2010

Received Fax from Medicaid requesting more changes. Called TMHP
Called Medicaid five different times. Major issue was extension of time to answer their change request.
Jordan Ticket # 731730404 Ingrid called
Michelle Ticket# 731732470 Ingrid called
Courtney Ticket # 731732547 Ingrid called
Vic Ticket # 73177850

Jordan again Ticket # 731753583 Ingrid called – he told Ingrid that a group app was not needed for subcontracted doctors and we should cancel group application. Then Ingrid and Patty faxed a letter requesting cancellation of Kintana #4050836. After we faxed the letter Ingrid called Isabelle Ortiz at 512-806-7478 and was told that we needed a group application and All subcontract doctors had to be included in the group app.

Called Medicaid and got Phoebe ticket #731734155 and asked her to remove our letter of requesting cancellation of group app. Phoebe assured us the letter was removed. Since we received subsequent correspondence from Medicaid dated Nov. 30th, our Kintana # 4050836 was still active.

## November 22, 2010

Sent letter with all requested changes to TMHP sent US Express Main

## November 30, 2010

Received another request for additional information from TMHP and since changes did not require signature the corrected pages were faxed to TMHP

## 2011

January 3, 2011

Sent signed EFT form with letter to TMHP

February 4, 2011

Received letter from TMHP denying group application request due to ongoing investigation

February 11, 2011

Sent letter regarding denial and a requesting formal appeal of that denial

Page 17

**May 24, 2011**

Dr. Olesen received a letter from TMHP giving a final decision on his group application.  They denied his application

**May 31, 2011**

Chase Bank removes $108,083.25 from Goodwin Orthodontics PLLC checking account #7184
US Attorney's office in Ft. Worth faxes seizure warrant to Indiana corporate office.

**June 7, 2011**

Herman & Weaver Law Offices faxes Affidavit in Support of Application of Seizure Warrant to Indiana Corp office.

**June 7, 2011**

FIRST MEETING WITH CLARK HOLESINGER
Recommended by Michael Back, he knew Medicaid and was a Federal Attorney
Paid signed contract and was asked to pay by Certified check for $5,000.00

## DEFENDANT'S AFFIDAVIT

I, Michael David Goodwin, swear / affirm under penalty of perjury that the following is true and accurate to the best of my knowledge and belief.

1. My name is Michael David Goodwin, I am over the age of 18 years old and able to make this affidavit pursuant to first hand knowledge.

2. I am the defendant in Criminal Case No. 2:12-CR-037-J and my trial counsel was Clark W. Holesinger.

3. In the above-mentioned matter, my counsel coerced me into changing my plea from not guilty to guilty, involuntarily.

4. My counsel told me, "the Prosecutor was very aggressive. She did not want to offer a plea agreement as she wanted to convict me, my wife, daughter-in-law and office manager."

5. My counsel hired William E. Kelly to be my 'local' attorney, but my counsel later said a conflict of interest existed and therefore, Kelly would represent my wife and      I would only be represented by him (Counsel Holesinger).

6. Later, my wife's counsel, William E. Kelly, told me "the prosecutor is going to dinner. If you don't agree to a plea before she leaves, you're going to jail for a very long time and Patty will also pay the price. I need to have your answer right now, before the agreement to drop the charges against her is off the table."

7. At that time, Kelly made a telephone call to my counsel (Holesinger). While on this conference call, Holesinger said, "I see no other way out. You're out of money" and he explained, "If you go to trial, without an adequate defense, not only would both of you be convicted, but you're office manager and possibly your daughter-in-law would also be convicted." So I asked, " I suppose I have no other options, is that

right?" He told me, "No."

8. During sentencing, my counsel (Holesinger) made it clear, when the Judge asked a question, he whispered to me, "just answer, yes."

9. I never saw a PSI or was explained anything by counsel regarding sentencing or calculation guidelines.

I, Michael David Goodwin, under penalty of perjury, hereby declare the above statement is true and accurate to the best of my knowledge and belief, pursuant to 18 U.S.C. §1746(1).

Michael David Goodwin
Reg. No.44899-177

EXHIBIT D

LETTER FROM DR. BARRON
DATED APRIL 3, 2014



**Dr. Rupert D. Barron, DDS**

**23 Crenshaw St.**

**Amarillo, TX 79124**

**Thursday, April 3, 2014**

**To whom it may concern:**

My first encounter with Sally Hilmer was when she questioned me about my association
with Dr. Michael Goodwin, DDS. She was very condescending and arrogant in a manner
in which she tried to intimidate me and question my integrity. Her first words to me were,
"Do you realize you could lose your dental license by being associated with Dr. Goodwin?"
It was very obvious her intentions were to prove fraud by Dr. Goodwin, at any cost.
Following this first meeting, I was subpoenaed to appear before a grand jury in Ft. Worth,
TX on May 16, 2012. Shirley Hilmer questions were very pointed that I was not qualified
or capable of working for Dr. Goodwin. She made the statement that I was not approved
by Medicaid to be issued a number. In fact, I was issued a number by Medicaid to be used
when I worked while Dr. Goodwin was out of the office. She continued to deny that a
number was ever issued. Dr. Goodwin has a letter from Medicaid issuing that number.
She then asked me if I was familiar with the dental laws and regulations, to which I
answered, yes. I explained that the state requires dentists to take jurisprudence as
continuing education. I had just completed that course as required by law. More than
once she questioned my credibility and qualifications to work in Dr. Goodwin's orthodontic
practice. In my private dental practice, I practiced the same orthodontia technique as Dr.
Goodwin. While employed at his office, I completed a continuing education course in
advanced orthodontics. I was asked to explain to the jury the procedure of placing the
braces on the patient and who was responsible for that procedure. Dr. Goodwin placed
the brackets on the study model after which a mold was made to hold the brackets in place.
Then a technique, indirect bonding, was performed on the patient by a dental assistant. I
was then asked to tell the jury who was responsible for the diagnosis and treatment
planning for the patients, to which I responded, only Dr. Goodwin. He never placed braces
on a patient who was not approved by Medicaid. My job description was to work only on
re-tie and impression days which usually were three to four days a month. These
procedures were performed by the assistants and I was to oversee their work. I was asked
to tell the jury what Dr. Goodwin paid me on the days I worked through the year. Several
months a year, I traveled from California to Texas to work for Dr. Goodwin on the days he
was out of the office; this was at my own expense. Sally Helmer's entire line of questioning
was to convince the jury that I was unqualified and Dr. Goodwin was intentionally
committing fraud. Several times during my employment, the office requested a

representative from Medicaid to come and oversee Dr. Goodwin's practice to make sure the office was in compliance. To my knowledge, Medicaid never followed up on the request.

While working with Dr. Goodwin or working alone in the office, I never saw any intent to commit fraud by Dr. Goodwin or his staff. Had I ever witnessed any irregularities that constituted fraud, I would have resigned. My reputation as a professional dentist would have been compromised.

To the best of my knowledge, this is how I recall the day of testifying before the grand jury on May16, 2012

Sincerely,

Dr. Rupert D. Barron, DDS

State of California
County of _RIVERSIDE_____
On _APRIL 3rd, 2014_ before me, _NAYAN P. GHELANI_ Notary Public,
personally appeared _DR. RUPERT D. BARRON_
who proved to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal. _____



NAYAN P. GHELANI
COMM. #2000011
Notary Public-California
RIVERSIDE
My Commission Expires Dec. 31, 2016

COUNT 5
Health Care Fraud
(Violations of 18 U.S.C.  1347 and 2)

Count 5  J.B. November 19, 2009  D8670   $100 Claim #200932351761186

November 5, 2009          Records D8670, record examination procedure, (per
                          Medicaid code requirement) were taken and submitted
                          to Medicaid for approval
                          **NO CHARGE AT THIS TIME.**

November 19, 2009         Patient approved for 11-5-2009 for records taken, billing
                          to Medicaid D8670 submitted on 11-19-2009, for
                          payment.

                          Impressions for "Swartz" expansion appliance were taken
                          on 11-19-2009, and billed for expansion appliance, Code
                          D8080, per Medicaid payment request already
                          approved.

**ALL PER MEDICAID PAYMENT SUBMISSION AND PAYMENT REQUEST**

_____, Joshua   **M**   11-23-92

7 Mesa Dr.        676-0590
Canyon, Texas 79015

☐ Male          Comp No. _____

☐ Female        Ret Model No. _____

Dentist: Dr. Nguyen

Parents: Randall & Dana Bullard          Phone:

Medicaid: 513226960  Auth: 168 264 2381      Cell: _____   **ORTHOCHART** __

Phase: II ↑↓SW · PB · Intr.   | L | 7 | 6 | 5 | 4 | 4 | 5 | 6 | 7 | R |
ext 8s ↑E's keep↓E's missing 5's

| DATE | TIME | | | | | | | | CEPH | PAN | PIX | IMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-- | 11:35 | EXAM | | | | | | | | TL | | |
| | | RECORDS | | | | | | | | | | |

| | | OH | EI | TODAY | NEXT VISIT | WIRE | WHEN |
|---|---|---|---|---|---|---|---|
| | 11:20 | | | imp ↑↓SW | TL ↑imps SW | | |
| 12-9 | 1:40 | UA | | | bond ↑ 22 | | |
| -13 | 9:10 | √↓ | | ①↑ ↑↓ ↑ | SC P1 ↑SW | | |
| 2-15 | 11:00 | √↓ | | ①2m T↓SW | LS↑ √exp | | |
| 2-10 | 12:00 | | | | ①√exp, Dr.G√ | | |
| 1-23-10 | 12:00 | √↓ | | ① adj ↓SW 3mm SC | | | |
| 5-10 | 9:30 | √ | ↓ | ① 5mmT↓ SC Dr √ | | | |
| | | | | Cont↑ hold↓ g/c | | | |
| 11-10 | 1:40 | √↓ | | ①3) bond↓6 hold/BR | bond ↓S direct | | |
| | | | | ↓SW | | | |
| 4-6-10 | 9:20 | UA | | | fully eng ↓JBW | 6/10 |
| 5-17-10 | 1:00 | | | | | |
| -9-10 | 1:30 | | | | | |
| 6-3-10 | 1:10 | | | | | |
| 6-07-10 | 10:30 | | | | | |
| 1-9-10 | 9:45 | | | | | |
| 4-10 | 9:40 | | | | | |
| -7-11 | 1:20 | | | | | |
| 2-17-11 | 10:50 | | | | | |
| 3-24-11 | 9:30 | | | After this visit Dr.Ck for next visit | |
| 4-8-11 | 2:10 | | | Broken chair | |
| -19-11 | 1:00 | | | | |
| 4-5-11 | 11:30 | | | | |

PAGE 1 OF 7



TEXAS MEDICAID & HEALTHCARE PARTNERSHIP
**A STATE MEDICAID CONTRACTOR**

# ICN: 100021030200932376244186
## CSI Search Details

[ Appeal Claim ]

| **Claim Information** | | **Patient Information** | |
|---|---|---|---|
| Claim # | 100 021 030 200932376244186 | Medicaid/CSHCN ID | 513226960 |
| Previous Claim # | | Name | BULLARD, JOSHUA J |
| Dates of Service | 11/19/2009 - 11/19/2009 | Date of Birth | 11/23/1992 |
| Status | Paid | Patient Account # | 513226960 |
| Status Date | 11/21/2009 | Medical Record # | |
| EOB / EOPS | 01147 | | |

| **Financial Information** | | **Provider Information** | |
|---|---|---|---|
| Billed Amount | $325.00 | Billing ID | 1477734598 |
| Paid Amount | $243.10 | Billing Name | GOODWIN, MICHAEL D |
| R&S Date | 11/27/2009 | Referring ID | |
| R&S Number | 036775187 | Referring Name | |
| Check Number | 000000032771730 | | |

### Claim Details

| Dtl # | Service Dates From | To | TOS | POS | Proc | NDC | NDC Qty | Mods | Diag | Qty | Billed Amount | Paid Amount | EOB / EOPS | Performing NPI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11/19/2009 | 11/19/2009 | W | 1 | D8670 | | 0.000000 | | | 1.0 | $100.00 | $68.10 | 00149 | 1477734598 |
| 2 | 11/19/2009 | 11/19/2009 | W | 1 | D8080 | | 0.000000 | | | 1.0 | $225.00 | $175.00 | 00149 | 1477734598 |

### EOB / EOPS codes messages

The following are the descriptions of the EOB (Explanation of Benefits) / EOPS (Explanation of Pending Status) codes that appear on this claim:

| 00149 | PROCEDURE PAYMENT BASED ON PROGRAM/BENEFIT PLAN, DATE OF SERVICE AND A MAXIMUM PAYMENT AMOUNT SET BY CMS OR HHSC. |
|---|---|
| 01147 | PLEASE REFER TO OTHER EOB MESSAGES ASSIGNED TO THIS CLAIM FOR PAYMENT/DENIAL INFORMATION. |

PAGE 2 OF 7

# PATIENT LEDGER                Goodwin Orthodontics PLLC

*08/21/12*

| | | |
|---|---|---|
| **Account:** 513226960 | **Medical Alert:** | |
| **Patient:** Joshua Bullard | **Status:** Active | |
| **Resp. Party:** Dana Bullard | **Est. Fin. Date:** 11/19/12 | **Ortho:** Y |
| **Relation:** Mother | **Dentist:** NGU | **Tmj:** N |
| **Resp. Party2:** | **Dob:** 11/23/92 | |
| **Relation2:** | **Sex:** M | |

| Total Bal. | Pat. Bal. | Primary | Secondary | Due Now | 0-30 | 31-60 | 61-90 | 90+ |
|---|---|---|---|---|---|---|---|---|
| 133.48 | 133.48 | 0.00 | 0.00 | **133.48** | 66.74 | 66.74 | 0.00 | 0.00 |
| | 0.00 | | | **0.00** | 0.00 | 0.00 | 0.00 | 0.00 |

| Date | Transaction | Reference | Amount | Current | Total | Emp |
|---|---|---|---|---|---|---|
| 01/13/10 | 2 Upper Braces | Z2011 | 300.00 | 300.00 | 300.00 | LOZ |
| 01/13/10 | 4 Arch Adjustment | | 68.10 | 368.10 | 368.10 | LOZ |
| 01/13/10 | 6 Maxillary Schwarz | | 250.00 | 618.10 | 618.10 | LOZ |
| 01/13/10 | 7 Mandibular Arch Expander | | 275.00 | 893.10 | 893.10 | LOZ |
| 01/21/10 | EBT | 01/13/2010 | -893.10 | 0.00 | 0.00 | LOZ |
| 02/15/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | LOZ |
| 02/23/10 | 4 Emergency Appt. | | 68.10 | 136.20 | 136.20 | LOZ |
| 02/24/10 | EBT | 02/15/2010 | -68.10 | 68.10 | 68.10 | LOZ |
| 03/11/10 | EBT | 02/23/10 | -68.10 | 0.00 | 0.00 | LOZ |
| 04/05/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | ANN |
| 04/12/10 | EBT | 04/05/10 | -68.10 | 0.00 | 0.00 | LOZ |
| 05/11/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 05/11/10 | 3 LOWER BRACES | | 300.00 | 368.10 | 368.10 | DD |
| 05/18/10 | EBT | 05/11/2010 | -368.10 | 0.00 | 0.00 | ANN |
| 08/09/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 08/16/10 | EBT | 08/09/2010 | -68.10 | 0.00 | 0.00 | ANN |
| 09/03/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 09/07/10 | EBT | 9/3/10 | -67.42 | 0.68 | 0.68 | DD |
| 09/07/10 | -.68 MCD RDCT | | -0.68 | 0.00 | 0.00 | DD |
| 10/07/10 | 4 Arch Adjustment | | 67.42 | 67.42 | 67.42 | DD |
| 10/11/10 | EBT | 10/07/10 | -67.42 | 0.00 | 0.00 | LOZ |
| 11/09/10 | 4 Arch Adjustment | | 67.42 | 67.42 | 67.42 | LOZ |
| 11/09/10 | 10 Palatal Bar | | 222.75 | 290.17 | 290.17 | LOZ |
| 12/14/10 | EBT | 11/09/2010 | -290.17 | 0.00 | 0.00 | ANN |
| 12/17/10 | 4 Arch Adjustment | | 67.42 | 67.42 | 67.42 | DD |
| 01/04/11 | EBT | 12/17/2010 | -67.42 | 0.00 | 0.00 | ANN |
| 01/07/11 | 4 Arch Adjustment | | 67.42 | 67.42 | 67.42 | LOZ |

*PAGE 3 OF 7*

| Date | Description | Ref Date | Amount | Balance | Running | Init |
|---|---|---|---|---|---|---|
| 01/13/11 | EBT | 01/07/11 | -67.92 | 0.00 | 0.00 | DD |
| 02/17/11 | 4 Arch Adjustment | | 66.74 | 66.74 | 66.74 | LOZ |
| 03/03/11 | EBT | 5/19/11 | -86.34 | -19.60 | -19.60 | ANN |
| 03/03/11 | EBT | 02/17/2011 | -66.74 | -86.34 | -86.34 | ANN |
| 04/08/11 | 4 Arch Adjustment | | 66.74 | -19.60 | -19.60 | DD |
| 05/06/11 | EBT | 04/08/2011 | -66.74 | -86.34 | -86.34 | ANN |
| 05/19/11 | 4 Arch Adjustment | | 66.74 | -19.60 | -19.60 | DD |
| 06/22/11 | 4 Arch Adjustment | | 66.74 | 47.14 | 47.14 | TW |
| 07/14/11 | 4 Arch Adjustment | | 66.74 | 113.88 | 113.88 | TW |
| 08/18/11 | 4 Arch Adjustment | | 66.74 | 180.62 | 180.62 | TW |
| 09/14/11 | EBT | 06/22/2011 | -66.74 | 113.88 | 113.88 | TW |
| 10/05/11 | 4 Arch Adjustment | | 66.74 | 180.62 | 180.62 | TW |
| 10/06/11 | EBT | 7/14/11 | -66.74 | 113.88 | 113.88 | DD |
| 10/21/11 | EBT | 8/18/11 | -66.74 | 47.14 | 47.14 | DD |
| 11/09/11 | FRM 5/19/11 | | 86.34 | 47.14 | 133.48 | DD |
| 11/09/11 | EBT | 10/5/11 | -66.74 | -19.60 | 66.74 | DD |
| 11/09/11 | EBT | 5/19/11 | -66.74 | 0.00 | 0.00 | DD |
| 11/15/11 | 4 Arch Adjustment | | 66.74 | 66.74 | 66.74 | TW |
| 11/15/11 | 5 Broken Bracket (1) | | 19.60 | 86.34 | 86.34 | TW |
| 12/16/11 | EBT | 11-15-11 | -86.34 | 0.00 | 0.00 | DD |
| 01/10/12 | 4 Arch Adjustment | | 66.74 | 66.74 | 66.74 | TW |
| 01/16/12 | EBT | 01/10/2012 | -66.74 | 0.00 | 0.00 | TW |
| 03/06/12 | 4 Arch Adjustment | | 66.74 | 66.74 | 66.74 | TW |
| 03/12/12 | EBT | 3/6/12 | -66.74 | 0.00 | 0.00 | DD |
| 04/18/12 | 4 Arch Adjustment | | 66.74 | 66.74 | 66.74 | TW |
| 05/04/12 | Check | 04/18/2012 | -66.74 | 0.00 | 0.00 | TW |
| 05/11/12 | 4 Arch Adjustment | | 66.74 | 66.74 | 66.74 | SH |
| 06/05/12 | 4 Arch Adjustment | | 66.74 | 133.48 | 133.48 | GM |
| 07/10/12 | EBT | 6/5/12 | -66.74 | 66.74 | 66.74 | DD |
| 08/20/12 | 4 Arch Adjustment | | 66.74 | 133.48 | 133.48 | TW |

PAGE 4 OF 7

# PATIENT CHART

08/18/12

| | |
|---|---|
| **Account:** 513226960 | **Medalert:** |
| **Patient:** Joshua Bullard | **Status:** Active |
| **Resp. Party:** Dana Bullard | **Promdate:** 11/19/12 |
| **Relation:** Mother | **Ortho:** Y | **Dentist:** NGU |
| | **Tmj:** N | **Dob:** 11/23/92 |
| **Resp. Party2:** | **Sex:** M |
| **Relation2:** | |

Tx. Notes

| Date | Procedure | | OH | UAW | LAW | X-Ray Coop | HCP | Next Procedure | Appointment |
|---|---|---|---|---|---|---|---|---|---|
| 12/14/09 | 4 Retie | | | | | | BAL | HKUP Direct | 01/13/10 09:00 |
| 12/18/09 | Moved (01/13/10 @ 09:00) | | | | | | BAL | HKUP Direct | 01/13/10 09:10 |
| 01/13/10 | 2 Upper Braces | Z2011 | | .018 | | | SG | 4 Check SW | 02/15/10 11:00 |
| | 6 Maxillary Schwarz | | | | | | SG | | / / |
| | 7 Mandibular Arch Expander | | | | | | SG | | / / |
| | 4 Arch Adjustment | | | | | | SG | | / / |
| | U/2-2 | | | | | | SG | | / / |
| 02/15/10 | 4 Retie Upper | | | .018 | | | LS | 4 Retie Upper | 05/11/10 1:40 |
| | | | | | | | LS | 4 DR G CHECK PT | 03/02/10 12:00 |
| 02/23/10 | Appointment Cancelled (03/02/10 @ 12:00) | | | | | | CAT | 4 DR G CHECK PT | 04/05/10 09:30 |
| 04/05/10 | 4 DR G CHECKED PT | | | | | | SG | 3,4 Lower Braces Direct | 05/11/10 1:40 |
| | HOLD LOWER CONT 1X4 UPPER, 5MM U/L | | | | | | SG | | / / |
| 05/11/10 | 3,4 Lower Braces Direct | Z2012 | F | | .018 NiT | | Bri | 4 Fully Eng | 06/16/10 09:20 |
| | | | | | | | Bri | 4 Check SW | 06/16/10 09:20 |
| 06/17/10 | BROKEN APPOINTMENT (06/16/10 @ 09:20) | | | | | | CC | 4 Fully Eng | 08/17/10 1:00 |
| | BROKEN APPOINTMENT (06/16/10 @ 09:20) | | | | | | CC | 4 Check SW | 08/17/10 1:00 |
| 08/03/10 | 0 Scheduled Appointment | | | | | | GO | 4 Check SW | 08/17/10 1:00 |
| 08/09/10 | Patient called for emergency | | P | | | | LL | Patient called for emergency | 08/09/10 1:30 |
| | 4 Emergency Appt. | | | | | | SG | 4 Check SW | 10/07/10 10:2 |
| | POKEY WIRE ON LOWER LEFT CUT WENT AHEAD AND | | | | | | SG | | / / |
| | RETIED TODAY SO HE WILL NOT NEED TO COME | | | | | | SG | | / / |
| | BACK UNTIL SEPTEMBER | | | | | | SG | | / / |
| | GIVEN | | | | | | SG | | / / |
| 08/09/10 | Rescheduled Appointment (08/17/10 @ 1:00) | | | | | | LL | 4 Check SW | 09/03/10 1:10 |
| 09/03/10 | 4 DR G CHECKED PT | | P | | .16X22 | | TAM | 4 DR G CHECK PT | 10/07/10 10:2 |
| | 4 Place Lower 1622N | | | | | | TAM | 10 PL PAL BAR | 10/07/10 10:2 |
| | IMPRESS FOR PB | | | | | | TAM | BOND THE UPPER 3 TO 6 | 10/07/10 10:: |
| | 4 Retie U/L | | | | | | TAM | LEFT | 10/07/10 10:: |
| | KEEP WEARING THE UPPER SW TO HOLD | | | | | | TAM | | / / |

Page 1

PAGE 5 OF 7

| Date | Description | | | | | | Init | Description | Date/Time |
|---|---|---|---|---|---|---|---|---|---|
| 10/07/10 | 4 DR G CHECKED PT | G | .018 | .018 NiT | | | Dus | 10 PL PAL BAR | 11/09/10 09:45 |
| | IMPRESS FOR PB | | | | | | Dus | 5/40 H-40 | 11/09/10 09:45 |
| | 4 Retie U/L | | | | | | Dus | ENGAGE LOWER LT 2 | 11/09/10 09:45 |
| | CONT TO WEAR BUT DONT TURN | | | | | | Dus | | / / |
| 10/15/10 | 1 LAB RECIEVED PB/FLA | | | | | | TD | | / / |
| 11/04/10 | Appointment Cancelled (11/09/10 @ 09:45) | | | | | | DD | 10 PL PAL BAR | 11/09/10 09:50 |
| | Appointment Cancelled (11/09/10 @ 09:45) | | | | | | DD | 5/40 H-40 | 11/09/10 09:50 |
| | Appointment Cancelled (11/09/10 @ 09:45) | | | | | | DD | ENGAGE LOWER LT 2 | 11/09/10 09:50 |
| 11/09/10 | 10 PL PAL BAR | G | .018 | .16X22 | | | LS | 4 Retie U/L | 12/17/10 09:40 |
| | 4 Retie U/L | | | | | | LS | 5/10 re | 12/17/10 09:40 |
| | 4 PL U 018N | | | | | | LS | | / / |
| | bond 3-5 u l&r | | | | | | LS | | / / |
| 12/17/10 | 4 Retie U/L | | | | | | TL | 4 DR G CHECK PT | 01/07/11 1:20 |
| | | | | | | | TL | 4/20 DR. CK | 01/07/11 1:20 |
| 01/07/11 | 4 DR G CHECKED PT | P | .16X22 | | | | SG | CK E'S | 02/17/11 12:50 |
| | 4 Retie U/L | | | | | | SG | CK OH | 02/17/11 12:50 |
| | 4 Place Upper 1622N | | | | | | SG | 4/RE | 02/17/11 12:50 |
| | 56/34 PC UPPER 3-3 | | | | | | SG | | / / |
| 02/17/11 | 4 U/L FPC | G | | | G | | LS | 4 U/L FPC | 03/24/11 09:20 |
| | CONT E'S | | | | | | LS | CK E'S | 03/24/11 09:20 |
| | | | | | | | LS | 5/10 RE | 03/24/11 09:20 |
| 04/08/11 | Patient called for emergency | | | | | | JR | Patient called for emergency | 04/08/11 2:10 |
| | PT MOM CALLED IN PT'S CHAIN IS BROKE | | | | | | JR | 4 U/L FPC | 05/19/11 1:00 |
| | 4 Place Upper FPC | | | | | | Dus | CK E'S | 05/19/11 1:00 |
| | 4 Place Lower FPC | | | | | | Dus | 5/10 RE | 05/19/11 1:00 |
| | CONT E'S | | | | | | Dus | | / / |
| 05/19/11 | 4 U/L FPC | | | | | | KA | 0 DR G CHECK PT | 06/15/11 11:30 |
| | CONT E'S | | | | | | KA | CK E'S | 06/15/11 11:30 |
| | | | | | | | KA | 4/DR CK-20 | 06/15/11 11:30 |
| 06/15/11 | Rescheduled Appointment (06/15/11 @ 11:30) | | | | | | SN | 0 DR G CHECK PT | 06/22/11 08:30 |
| | Rescheduled Appointment (06/15/11 @ 11:30) | | | | | | SN | CK E'S | 06/22/11 08:30 |
| | Rescheduled Appointment (06/15/11 @ 11:30) | | | | | | SN | 4/DR CK-20 | 06/22/11 08:30 |
| 06/22/11 | 0 DR G CHECKED PT | G | | | P | | SG | Reposition | 07/14/11 2:40 |
| | 0 Pano | | | | | | SG | REPO LOWER E'S, 4'S AND | 07/14/11 2:40 |
| | 4 Retie U/L | | | | | | SG | | / / |
| | RT 34/34 LT 3/34 4/45 | | | | | | SG | | / / |
| 07/14/11 | Reposition | P | | | | | Dus | 4 Retie | 08/18/11 3:00 |
| | REPO LOWER E'S | | | | | | Dus | CAN WE BOND LOWER LT | 08/18/11 3:00 |
| | 4 DUE TO POOR OH | | | | | | Dus | 4?? | 08/18/11 3:00 |

PAGE 6 OF 7

| Date | Notes | | | | Init | Notes | Date/Time |
|---|---|---|---|---|---|---|---|
| 08/18/11 | POH. Instructions | | | | TL | 0 DR G CHECK PT | 10/05/11 11:30 |
| | 4 Place Upper FPC | | | | TL | CK E'S | 10/05/11 11:30 |
| | CONT E'S | | | | TL | CK OH | 10/05/11 11:30 |
| | SENT PT TO BRUSH | | | | TL | 4/20 DR CK, CK LOWER E'S | 10/05/11 11:30 |
| | | | | | TL | OH | 10/05/11 11:30 |
| 10/05/11 | 0 DR G CHECKED PT | | | | Eli | Reposition | 11/07/11 1:10 |
| | 4 Retie U/L | | | | Eli | 4/30-REPO | 11/07/11 1:10 |
| | REMOVE PB. | | | | Eli | LOWER 6'S, LR2,LL2 | 11/07/11 1:10 |
| | | | | | Eli | | 11/07/11 1:10 |
| | | | | | Eli | SQUARE WIRE START 56/7 | 11/07/11 1:10 |
| | | | | | Eli | L&R | 11/07/11 1:10 |
| | | | | | Eli | REVIEW FOR EXT OF LOWER | 11/07/11 1:10 |
| | | | | | Eli | MOLARS | 11/07/11 1:10 |
| 11/07/11 | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | Reposition | 12/31/99 12:00 |
| | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | 4/30-REPO | 12/31/99 12:00 |
| | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | LOWER 6'S, LR2,LL2 | 12/31/99 12:00 |
| | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | | 12/31/99 12:00 |
| | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | SQUARE WIRE START 56/7 | 12/31/99 12:00 |
| | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | L&R | 12/31/99 12:00 |
| | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | REVIEW FOR EXT OF LOWER | 12/31/99 12:00 |
| | BROKEN APPOINTMENT (11/07/11 @ 1:10) | | | | SN | MOLARS | 12/31/99 12:00 |
| 11/15/11 | 0 Scheduled Appointment | P | .16X22 | | TEM | Reposition | 11/15/11 12:20 |
| | THIS PT SAID THEY HAD A APP TODAY BUT WASNT | | | | TEM | Reposition | 01/10/12 12:50 |
| | SCHEDULED BUT PER AH SAID TO SEE THEM TODAY | | | | TEM | CK OH | 01/10/12 12:50 |
| | 4 Retie U/L | | | | KA | 4/REPO-30   REPO LOWER 6'S | 01/10/12 12:50 |
| | POH. Instructions | | | | KA | LR2 LL2 | 01/10/12 12:50 |
| | 5X1 UL6, UNABLE TO REPO DUE TO OH , WENT | | | | KA | | / / |
| | OVER POH WITH PT. ALSO HAD TO REPLACE UAW | | | | KA | | / / |
| | DUE TO IT BEING TOO SHORT | | | | KA | | / / |
| | HAD A CARD WITH THE WRONG DATE IN OUR | | | | SH | | / / |
| | COMPUTER SO WAS A MISTAKE IN THE SYSTEM | | | | SH | | / / |
| 01/10/12 | 0 DR G CHECKED PT | P | | .018 NiT | CH | Reposition | 02/09/12 1:00 |
| | 4 Retie Lower | | | | CH | 4/RP UL125 | 02/09/12 1:00 |
| | BOND LL7 LR7 REPO LL2 LR2 | | | | CH | | / / |
| | 0 Pano | | | | CH | | / / |
| 02/09/12 | BROKEN APPOINTMENT (02/09/12 @ 1:00) | | | | LC | Reposition | 03/06/12 12:2 |
| | BROKEN APPOINTMENT (02/09/12 @ 1:00) | | | | LC | 4/RP UL125 | 03/06/12 12:2 |
| 02/17/12 | Moved (03/06/12 @ 12:20) | | | | SN | Reposition | 03/06/12 12:2 |
| | Moved (03/06/12 @ 12:20) | | | | SN | 4/RP UL125 | 03/06/12 12:2 |

PAGE 7 OF 9

COUNT 6 & 10

Health Care Fraud
(Violations of 18 U.S.C.   1347 and 2)

COUNT 6 & 10,   Patient  R.B., December 17, 2009  D8220 & 1057D $300
Claim # 200935159251693
Claim # 201004673072421

**Dr. Baron has Orthodontic clinic duty and on site.**

December 17, 2009, # 4 – Arch adjustment       D8670     $100 / 68 Med. Pay
                      # 5 – Broken Bracket          D8690      $50 / 20 Med. Pay
                      #10- Palatal Bar appliance  D8220     $300 /225 Med. Pay

February 15, 2010       Charge for intrusion arch           $ 200/ 99 Med. Pay
                        Charge for arch adjustment          $ 100/68.10 Med. Pay

**All Medicaid rules and requirements and HIPPA regulations were being followed, and proper Medicaid billing submitted.**

Enclosure 1-7
# 1.  Indictment  page 16
# 2.  Indictment  page 18
# 3.  Patient Chart R.B., hand written and approved per Dr. on site.
# 4.  Medicaid CSI Search Details Medicaid payment disbursement
# 5.  Dr. Goodwin's computer patient ledger
# 6.  Dr. Goodwin's computer patient chart
# 7.  Dr. Goodwin's computer patient chart continued

| Count Number | Patient | Date of Service | CPT Code Billed | Amount Billed | Claim Number |
|---|---|---|---|---|---|
| 3 | Z.R. | October 16, 2008 | D8670 | $100.00 | 200829453331213 |
| 4 | T.U. | February 24, 2009 | D8670 | $100.00 | 200907190904839 |
| 5 | J.B. | November 19, 2009 | D8670 | $100.00 | 200932351761186 |
| 6 /10 | R.B. | December 17, 2009 | D8220 & 1057D | $300.00 | 200935159251693 |
| 7 /11 | S.A. | April 22, 2010 | D8670 | $100.00 | 201011389971934 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

ENCLOSURE 1

Case 2:14-cv-00091-J-BB   Document 1   Filed 04/14/14   Page 78 of 95   PageID 78

Case 2:12-cr-00037-J-BB   Document 32   Filed 09/12/12   Page 18 of 24   PageID 115

| Count Number | Patient | Date of Service | CPT Code(s) Billed | Amount Billed | Claim Number |
|---|---|---|---|---|---|
| 8 | A.B. | July 28, 2009 | D8670 | $100.00 | 200920973909400 |
| 9 | J.A. | November 16, 2009 | D8670 | $100.00 | 200932050896487 |
| 10 | R.B. | February 15, 2010 | D8210 & 1027D | $200.00 | 201004673072421 |
| 11 | S.A. | May 17, 2010 | D8690 | $50.00 | 201013795933125 |
| 12 | D.A. | February 18, 2011 | D8670 | $100.00 | 201104968342294 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

ENCLOSURE 2

Buckallew, Raylene    F    8/26/95

Comp No. 9009020

1616 W. Cliffside
~~1116 Bluebell~~ 79108    ~~806-444-5309~~
Amarillo, TX ~~79107~~    477-8660

☐ Male
☐ Female

Ret Model No. _____

Dentist: Lamb    Parent: Freedom Ward

Phone:

Med.#529054011    Auth# 458 215 8341

Cell: _____

**ORTHOCHART**

• Palbar        • missing laterals
• Intrusion    • hold space for lateral replace
•              • poss. Frectomy

| L | 7 | 6 | 5 | 4 | 3 | 5 | 6 | 7 | R |
|---|---|---|---|---|---|---|---|---|---|
|   |   |   |   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |   |   |   |

|       | CEPH | PAN | PIX | IMP |
|-------|------|-----|-----|-----|
| EXAM  | L    |     |     |     |
| RECORDS |    |     |     |     |

| DATE | TIME | OH | EI | TODAY | NEXT VISIT | WIRE | WHEN |
|------|------|----|----|-------|-----------|------|------|
|      |      |    |    | ① impress ↑ind & PB  BR | impress ↑ind & Palbar. sep | | |
| 11-17 | 8:30 | ✓ | | ④② Fit ↑ ⑥ Int | band ↑ind, fit bands↑ | | |
|      |      |    |    |  mar↑ | sep ↑6's | | |
|      |      |    |    |       | Pl Palbar. | | |
| 12-10 | 3:15 | CA | | | ④ Sep ↑6's for P.Bar | | 4/10 |
| 12-17 | 9:20 | | | | ④⑩ Pl. Pcl & new AW through 6) | | 5/30 |
| 12-19 | | | | ⑥⑤xl reb ↑r↑l  BR | | | |
|      |      |    |    | ④⑤ BBX2  LS | | | |
| 12-16 | 2:15 | ✓ | | ① Sep ↑6's  SG | | | |
| 12-19 | 9:20 | | | | | | |
| 12-17 | 9:20 | | | ④⑤X1 ①D reb ↑L5  BR | | | |
| 1-19 | 3:10 | | | | ④ ↑16 22CN PCl-1 3-6 | | |
| 2-15 | 2:30 | V | | ④ ⑩ ↑1-1 chain + ↑intrusion | ↑16 22RCH | | |
| 4-2:10 | 3:00 | | ④ | 3 tale chains + 1 tl chain | Dr. ✓ (can we bond ↓'s next app?) | | 5/20 |
| 5-1-10 | 1:10 | ✓ | $ | ④③ B↑↓ID | ④⑤ Bond ↓id | | 30 |
|      |      |    |    | | ④ ↓ax ↑16x22U | | |
|      |      |    |    | | PC ↓3-36 | | 5/10 |
| 6-16-10 | 10:40 | | | ④ Re Re ↑↓ | | | |
| 7-2-10 | 12:10 | ✓ | | | a | | |
| 8-9-10 | 11:03 | | | | AW above ↑ Rt 4, Lt 3,4 & Sep Lt 6 | | 3/10 |
| 8-16-10 | 1:00 | | | | PC ↓ Lt 6 Band is not too low | | |
| 8-10-10 | 10:50 | | | Comp SA | AW above↑ Rt 4 Lt 3,4 & Sep Lt 6 | | |
| 8-16-10 | 1:00 | (PS Mom) | | | P+C ↓ Lt 6 bond is not too low | | |
| 8-17-10 | 2:10 | | | | | | |
| 9-16-10 | 1:00 | mar | | | ENCLOSURES | | |
| 10-13-10 | 10:20 | | | | | | |



**TEXAS MEDICAID & HEALTHCARE PARTNERSHIP**
**TMHP** **A STATE MEDICAID CONTRACTOR**

# ICN: 20002103020093518453693
## CSI Search Details

[ Appeal Claim ]

### Claim Information

| | |
|---|---|
| Claim # | 200 021 030 200935184533693 |
| Previous Claim # | |
| Dates of Service | 12/17/2009 - 12/17/2009 |
| Status | Paid |
| Status Date | 12/19/2009 |
| EOB / EOPS | 01147 |

### Patient Information

| | |
|---|---|
| Medicaid/CSHCN ID | 529054011 |
| Name | BUCKALLEW, RAYLENE |
| Date of Birth | 8/26/1995 |
| Patient Account # | 529054011 |
| Medical Record # | |

### Financial Information

| | |
|---|---|
| Billed Amount | $450.00 |
| Paid Amount | $313.10 |
| R&S Date | 12/25/2009 |
| R&S Number | 036917798 |
| Check Number | 000000032927341 |

### Provider Information

| | |
|---|---|
| Billing ID | 1477734598 |
| Billing Name | GOODWIN, MICHAEL D |
| Referring ID | |
| Referring Name | |

### Claim Details

| Dtl # | Service Dates From | To | TOS | POS | Proc | NDC | NDC Qty | Mods | Diag Qty | Billed Amount | Paid Amount | EOB / EOPS | Performing NPI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/17/2009 | 12/17/2009 | W | 1 | D8670 | | 0.000000 | | 1.0 | $100.00 | $68.10 | 00149 | 1477734598 |
| 2 | 12/17/2009 | 12/17/2009 | W | 1 | D8690 | | 0.000000 | | 1.0 | $50.00 | $20.00 | 00149 | 1477734598 |
| 3 | 12/17/2009 | 12/17/2009 | W | 1 | D8220 | | 0.000000 | | 1.0 | $300.00 | $225.00 | 00149 | 1477734598 |

### EOB / EOPS codes messages

**The following are the descriptions of the EOB (Explanation of Benefits) / EOPS (Explanation of Pending Status) codes that appear on this claim:**

| | |
|---|---|
| 00149 | PROCEDURE PAYMENT BASED ON PROGRAM/BENEFIT PLAN, DATE OF SERVICE AND A MAXIMUM PAYMENT AMOUNT SET BY CMS OR HHSC. |
| 01147 | PLEASE REFER TO OTHER EOB MESSAGES ASSIGNED TO THIS CLAIM FOR PAYMENT/DENIAL INFORMATION. |

*ENCLOSURE 4*

*08/18/12*

| | |
|---|---|
| **Account:** 529054011 | **Medical Alert:** |
| **Patient:** Raylene Buckallew | **Status:** Active |
| **Resp. Party:** Freedom Ward | **Est. Fin. Date:** 10/22/12 |
| **Relation:** Mother | **Dentist:** |
| **Resp. Party2:** | **Dob:** 08/26/95 |
| **Relation2:** | **Sex:** F |

Ortho: Y
Tmj: N

| Total Bal. | Pat. Bal. | Primary | Secondary | Due Now | 0-30 | 31-60 | 61-90 | 90+ |
|---|---|---|---|---|---|---|---|---|
| 0.00 | 0.00 | 0.00 | 0.00 | **0.00** | 0.00 | 0.00 | 0.00 | 0.00 |
| | 0.00 | | | **0.00** | 0.00 | 0.00 | 0.00 | 0.00 |

| Date | Transaction | Reference | Amount | Current | Total | Emp |
|---|---|---|---|---|---|---|
| 12/16/09 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | LOZ |
| 12/17/09 | 4 Arch Adjustment | | 68.10 | 136.20 | 136.20 | LOZ |
| 12/17/09 | 5 Broken Bracket | | 20.00 | 156.20 | 156.20 | LOZ |
| 12/17/09 | 10 Palatal Bar | | 225.00 | 381.20 | 381.20 | LOZ |
| 12/25/09 | EBT | 12/16/09 | -68.10 | 313.10 | 313.10 | LOZ |
| 12/25/09 | EBT | 12/17/09 | -313.10 | 0.00 | 0.00 | LOZ |
| 02/15/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | LOZ |
| 02/15/10 | 11 Intrusion Arch | | 100.00 | 168.10 | 168.10 | LOZ |
| 02/25/10 | EBT | 02/15/10 | -168.10 | 0.00 | 0.00 | LOZ |
| 04/02/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | LOZ |
| 04/06/10 | EBT | 04/02/2010 | -68.10 | 0.00 | 0.00 | ANN |
| 05/13/10 | 3 LOWER BRACES | | 300.00 | 300.00 | 300.00 | LOZ |
| 05/13/10 | 4 Arch Adjustment | | 68.10 | 368.10 | 368.10 | LOZ |
| 05/20/10 | EBT | 05/11/2010 | -368.10 | 0.00 | 0.00 | ANN |
| 07/02/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 07/13/10 | EBT | 07/02/2010 | -68.10 | 0.00 | 0.00 | ANN |
| 08/10/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 08/16/10 | EBT | 08/10/2010 | -68.10 | 0.00 | 0.00 | ANN |
| 10/13/10 | 4 Arch Adjustment | | 67.42 | 67.42 | 67.42 | DD |
| 10/21/10 | EBT | 10/13/10 | -67.42 | 0.00 | 0.00 | DD |
| 11/15/10 | 4 Arch Adjustment | | 67.42 | 67.42 | 67.42 | LOZ |
| 12/14/10 | EBT | 11/15/2010 | -67.42 | 0.00 | 0.00 | ANN |

*ENCLOSURE 8'*

# PATIENT CHART

08/20/12

| Account: 529054011 | Medalert: |
| Patient: Raylene Buckallew | Status: Active |
| Resp. Party: Freedom Ward | Promdate: 10/22/12 |
| Relation: Mother | Dentist: |
| Resp. Party2: | Dob: 08/26/95 |
| Relation2: | Sex: F |

Ortho: Y
Tmj: N

Tx. Notes

| Date | Procedure | OH | UAW | LAW | X-Ray Coop | HCP | Next Procedure | Appointment |
|------|-----------|----|----|-----|------|-----|----------------|-------------|
| 12/16/09 | Separators | | | | | SG | 10 Palatal Bar | 01/19/10 3:10 |
| | 4 Arch Adjustment | | | | | SG | | / / |
| 12/17/09 | 4 Arch Adjustment | G | .018 | | | Bri | 11 1622 RCN Upper | 01/19/10 3:10 |
| | 5 Broken Bracket | | | | | Bri | PC UPPER 1-1 6-3 | 01/19/10 3:10 |
| | 10 Palatal Bar | | | | | Bri | | / / |
| | 5*1 REB UL5 | | | | | Bri | | / / |
| 01/19/10 | Moved (01/19/10 @ 3:10) | | | | | MEL | 10 Palatal Bar | 02/15/10 3:40 |
| 01/19/10 | Moved (02/15/10 @ 3:40) | | | | | MEL | 10 Palatal Bar | 02/15/10 2:30 |
| 02/15/10 | 11 Place 1622 RCN Upper | | | | | SG | 4 DR G CHECK PT | 04/02/10 3:00 |
| | 4 Retie Upper | | | | | SG | ARE WE READY TO BOND THE | 05/11/10 1:10 |
| | | | | | | SG | LOWER ARCH? | 05/11/10 1:10 |
| 04/02/10 | 4 Retie Upper | E | .16X22 | | | TAM | 3,4 BOND LOWER INDIRECT | 05/11/10 1:10 |
| | 4 DR G CHECKED PT | | | | | TAM | | / / |
| | 4 IMPRESS LOWER IND | | | | | TAM | | / / |
| 05/13/10 | 3,4 BOND LOWER INDIRECT ONLY   Z2012 | | | | | SG | 4 Place Lower 1622N | 06/16/10 10:4 |
| | TX DONE 5-11-10 @ 1:10 | | | | | SG | 4 PL LOWER 6-3 PC | 06/16/10 10:4 |
| 06/17/10 | BROKEN APPOINTMENT (06/16/10 @ 10:40) | | | | | CC | 4 Place Lower 1622N | 07/02/10 12:1 |
| | BROKEN APPOINTMENT (06/16/10 @ 10:40) | | | | | CC | 4 PL LOWER 6-3 PC | 07/02/10 12:1 |
| 06/29/10 | 0 Broken Appt | | | | | SU | 4 Place Lower 1622N | 07/02/10 12:1 |
| 07/02/10 | 4 DR G CHECKED PT | F | .16X22 | .018 NiT | | Dus | 4 Sep LL6 | 08/09/10 11:0 |
| | 4 Sep LL6 | | | | | Dus | 4 F&C LL6 | 08/16/10 1:0 |
| 08/09/10 | Moved (08/09/10 @ 11:00) | | | | | LL | 4 Sep LL6 | 08/09/10 3:2 |
| 08/09/10 | Rescheduled Appointment (08/09/10 @ 3:20) | | | | | LL | 4 Sep LL6 | 08/10/10 10:5 |
| 08/09/10 | Moved (08/10/10 @ 10:50) | | | | | GO | 4 Sep LL6 | 08/10/10 12:0 |
| 08/10/10 | 4 Retie Upper | G | .16X22 | | | SG | | / / |
| | Sep LL6 | | | | | SG | | / / |
| | WIRE ABOVE UR 4 UL 34 | | | | | SG | | / / |
| 08/16/16 | Rescheduled Appointment (08/16/10 @ 1:00) | | | | | LL | 4 F&C LL6 | 08/17/10 2:1 |
| 08/17/10 | 4 F&C LL6 | | | | | SG | 4 DR G CHECK PT | 09/16/10 1:1 |

ENCLOSURE 6

| Date | Description | | | | | Init | Description | Date/Time |
|---|---|---|---|---|---|---|---|---|
| | 4 Retie Lower | | | | | KM | 4 DR G CHECK PT | 10/13/10 10:20 |
| 09/17/10 | BROKEN APPOINTMENT (09/16/10 @ 1:10) | | | | | | | |
| 10/13/10 | 4 DR G CHECK PT | G | .018 | .018 NiT | PC | LS | Reposition | 11/15/10 12:00 |
| | 4 Retie U/L | | | | | LS | REPO U 4-4  5/40 RP | 11/15/10 12:00 |
| 11/15/10 | Appointment Cancelled (11/15/10 @ 12:00) | | | | | GO | Reposition | 11/15/10 2:15 |
| | Appointment Cancelled (11/15/10 @ 12:00) | | | | | GO | REPO U 4-4  5/40 RP | 11/15/10 2:15 |
| | Rescheduled Appointment (11/15/10 @ 2:15) | | | | | GO | Reposition | 11/15/10 2:15 |
| | Rescheduled Appointment (11/15/10 @ 2:15) | | | | | GO | REPO U 4-4  5/40 RP | 11/15/10 2:15 |
| | 4 DR G CHECKED PT | | | | | CH | 4 Place Lower 1622N | 12/16/10 3:10 |
| | 4 Place Upper 1622N | | | | | CH | 4 Retie U/L | 12/16/10 3:10 |
| | 4 Retie U/L | | | | | CH | 5/RE | 12/16/10 3:10 |
| | REPO U 4-4 FOR HEIGHT | | | | | CH | CHECK TO PL OCS UPR 2'S | 12/16/10 3:10 |
| 12/17/10 | BROKEN APPOINTMENT (12/16/10 @ 3:10) | | | | | TEM | 4 Place Lower 1622N | 03/22/11 09:10 |
| | BROKEN APPOINTMENT (12/16/10 @ 3:10) | | | | | TEM | 4 Retie U/L | 03/22/11 09:10 |
| | BROKEN APPOINTMENT (12/16/10 @ 3:10) | | | | | TEM | 5/RE | 03/22/11 09:10 |
| | BROKEN APPOINTMENT (12/16/10 @ 3:10) | | | | | TEM | CHECK TO PL OCS UPR 2'S | 03/22/11 09:10 |
| 02/01/11 | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | DD | 4 Place Lower 1622N | 03/22/11 09:10 |
| | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | DD | 4 Retie U/L | 03/22/11 09:10 |
| | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | DD | 5/RE | 03/22/11 09:10 |
| | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | DD | CHECK TO PL OCS UPR 2'S | 03/22/11 09:10 |
| 03/21/11 | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | JR | 4 Place Lower 1622N | 04/08/11 09:50 |
| | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | JR | 4 Retie U/L | 04/08/11 09:50 |
| | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | JR | 5/RE | 04/08/11 09:50 |
| | Rescheduled Appointment (03/22/11 @ 09:10) | | | | | JR | CHECK TO PL OCS UPR 2'S | 04/08/11 09:50 |
| | PT IN HOSPITAL WILL CALL BK TO RES | | | | | JR | | / / |

ENCLOSURE 7

EXHIBIT G

COUNT 7 & 11
Health Care Fraud
(Violations of 18 U.S.C.   1347 and 2)

COUNT 7 & 11 S.A.  April 22, 2010  D8670  $100 Claim #201011389971934

Dr. Baron is the office

April 22, 2010      Impressions for lower indirect bonding
                    Arch adjustment  $100 /68

Mary 17, 2010      # 4 arch adjustment $100-68
                    # 5 broken brackets $20

Note:  Only one bracket was charged



001290243635 MAY 20 #0000001738 $3,628.00

# PATIENT LEDGER

Goodwin Orthodontics

06/29/11

| Account: 516817684 | Medical Alert: |
| Patient: Samantha Allgood | Status: Active |
| Resp. Party: Randall Allgood | Ortho: Y | Est. Fin. Date: 10/22/12 |
| Relation: Father | Tmj: N | Dentist: |
| Resp. Party2: | | Dob: 06/04/96 |
| Relation2: | | Sex: F |

| Total Bal. | Pat. Bal. | Primary | Secondary | Due Now | 0-30 | 31-60 | 61-90 | 90+ |
|---|---|---|---|---|---|---|---|---|
| 66.74 | 66.74 | 0.00 | 0.00 | 66.74 | 66.74 | 0.00 | 0.00 | 0.00 |
| | 0.00 | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| Date | Transaction | Reference | Amount | Current | Total | Emp |
|---|---|---|---|---|---|---|
| 12/04/09 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | LOZ |
| 12/14/09 | 4 Arch Adjustment | | 68.10 | 136.20 | 136.20 | LOZ |
| 12/14/09 | 5 Broken Bracket | | 20.00 | 156.20 | 156.20 | LOZ |
| 12/14/09 | 11 Intrusion Arch | | 100.00 | 256.20 | 256.20 | LOZ |
| 12/18/09 | EBT | 12/04/09 | -68.10 | 188.10 | 188.10 | LOZ |
| 01/14/10 | 4 Arch Adjustment | | 68.10 | 256.20 | 256.20 | CRI |
| 01/20/10 | EBT | 01/14/2010 | -68.10 | 188.10 | 188.10 | LOZ |
| 02/15/10 | 4 Arch Adjustment | | 68.10 | 256.20 | 256.20 | LOZ |
| 02/25/10 | EBT | 2/15/10 | -68.10 | 188.10 | 188.10 | LOZ |
| 04/02/10 | 4 Arch Adjustment | | 68.10 | 256.20 | 256.20 | ANN |
| 04/02/10 | 5 Broken Bracket (1) | | 20.00 | 276.20 | 276.20 | ANN |
| 04/02/10 | 4 Arch Adjustment | | 68.10 | 344.30 | 344.30 | ANN |
| 04/02/10 | 4 Arch Adjustment | | 68.10 | 412.40 | 412.40 | ANN |
| 04/02/10 | 4 Arch Adjustment | | 68.10 | 480.50 | 480.50 | ANN |
| 04/02/10 | 5 Broken Bracket (1) | | 20.00 | 500.50 | 500.50 | ANN |
| 04/02/10 | -224.30 put in to many times | | -224.30 | 276.20 | 276.20 | ANN |
| 04/05/10 | EBT | 04/02/2010 | -88.10 | 188.10 | 188.10 | ANN |
| 04/22/10 | 4 Arch Adjustment | | 68.10 | 256.20 | 256.20 | DD |
| 04/29/10 | EBT | 04/22/10 | -68.10 | 188.10 | 188.10 | LOZ |
| 04/29/10 | EBT | 12/14/10 | -188.10 | 0.00 | 0.00 | LOZ |
| 05/17/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 05/17/10 | 5 Broken Bracket (1) | | 20.00 | 88.10 | 88.10 | DD |
| 05/25/10 | EBT | 5/17/10 | -88.10 | 0.00 | 0.00 | DD |
| 06/14/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 06/21/10 | EBT | 06/14/10 | -68.10 | 0.00 | 0.00 | DD |
| 07/08/10 | 4 Arch Adjustment | | 68.10 | 68.10 | 68.10 | DD |
| 07/16/10 | 4 Arch Adjustment | | 68.10 | 136.20 | 136.20 | LOZ |

(c) 1995-2010 OrthoChart, L.L.C.   2 OF 14

| Date | Description | Ref Date | Amount | Balance | Balance | Init |
|---|---|---|---|---|---|---|
| | | | 20.00 | 158.20 | 158.20 | |
| 07/16/10 | 5 Broken Bracket (1) | 07/16/2010 | -88.10 | 68.10 | 68.10 | ANN |
| 07/19/10 | EBT | 07/08/10 | -68.10 | 0.00 | 0.00 | DD |
| 07/19/10 | EBT | | 68.10 | 68.10 | 68.10 | DD |
| 08/06/10 | 4 Arch Adjustment | | 20.00 | 88.10 | 88.10 | DD |
| 08/06/10 | 5 Broken Bracket (1) | | 20.00 | 108.10 | 108.10 | DD |
| 08/06/10 | 5 Broken Bracket (1) | | 68.10 | 176.20 | 176.20 | LOZ |
| 08/09/10 | 4 Arch Adjustment | | 20.00 | 196.20 | 196.20 | LOZ |
| 08/09/10 | 5 Broken Bracket (1) | | 20.00 | 216.20 | 216.20 | LOZ |
| 08/09/10 | 5 Broken Bracket (1) | 08/06/2010 | -108.10 | 108.10 | 108.10 | ANN |
| 08/16/10 | EBT | 08/09/2010 | -108.10 | 0.00 | 0.00 | ANN |
| 08/16/10 | EBT | | 68.10 | 68.10 | 68.10 | DD |
| 09/03/10 | 4 Arch Adjustment | 9/3/10 | -67.42 | 0.68 | 0.68 | DD |
| 09/07/10 | EBT | | -0.68 | 0.00 | 0.00 | DD |
| 09/07/10 | -.68 MCD RDCT | | 67.42 | 67.42 | 67.42 | DD |
| 10/19/10 | 4 Arch Adjustment | | 67.42 | 134.84 | 134.84 | DD |
| 11/05/10 | 4 Arch Adjustment | | 67.42 | 202.26 | 202.26 | DD |
| 12/10/10 | 4 Arch Adjustment | 10/19/2010 | -67.42 | 134.84 | 134.84 | ANN |
| 12/13/10 | EBT | 11/05/2010 | -67.42 | 67.42 | 67.42 | ANN |
| 12/13/10 | EBT | 12/10/2010 | -67.42 | 0.00 | 0.00 | ANN |
| 12/13/10 | EBT | | 67.42 | 67.42 | 67.42 | LOZ |
| 02/07/11 | 4 Arch Adjustment | | 19.80 | 87.22 | 87.22 | LOZ |
| 02/07/11 | 5 Broken Bracket (1) | | 19.80 | 107.02 | 107.02 | LOZ |
| 02/07/11 | 5 Broken Bracket (1) | | 19.80 | 126.82 | 126.82 | LOZ |
| 02/07/11 | 5 Broken Bracket (1) | | 19.80 | 146.62 | 146.62 | LOZ |
| 02/07/11 | 5 Broken Bracket (1) | | 19.80 | 166.42 | 166.42 | LOZ |
| 02/07/11 | 5 Broken Bracket (1) | 2/7/11 | -164.74 | 1.68 | 1.68 | DD |
| 02/22/11 | EBT | | -1.68 | 0.00 | 0.00 | DD |
| 02/22/11 | -1.68 mcd rdct | | 66.74 | 66.74 | 66.74 | DD |
| 03/22/11 | 4 Arch Adjustment | 03/22/11 | -66.74 | 0.00 | 0.00 | LOZ |
| 03/29/11 | EBT | | 66.74 | 66.74 | 66.74 | LOZ |
| 05/23/11 | 4 Arch Adjustment | | 19.60 | 86.34 | 86.34 | LOZ |
| 05/23/11 | 5 Broken Bracket (1) | | 19.60 | 105.94 | 105.94 | LOZ |
| 05/23/11 | 5 Broken Bracket (1) | 5/23/11 | -105.94 | 0.00 | 0.00 | DD |
| 06/03/11 | EBT | | 66.74 | 66.74 | 66.74 | TV |
| 06/16/11 | 4 Arch Adjustment | | | | | |

Pt
Samantha, Allgood

(c) 1995-2010 OrthoChart, L.L.C.

3 OF 14

Jun. 29 2011 11:46AM   HP LASERJET FAX

# PATIENT CHART
*06/06/11*

| Account: 516817684 | | | Medalert: |
|---|---|---|---|
| Patient: Samantha Allgood | | | Status: Active |
| Resp. Party: Randall Allgood | Ortho: Y | | Promdate: 10/22/12 |
| Relation: Father | Tmj: N | | Dentist: |
| Resp. Party2: | | | Dob: 06/04/96 |
| Relation2: | | | Sex: F |

| Date | Procedure | OH | UAW | LAW | X-Ray Coop | HCP | Next Procedure | Appointmen |
|---|---|---|---|---|---|---|---|---|
| 12/04/09 | 4 Arch Adjustment | | | | | TL | 4 Arch Adjustment | 01/14/10 1:30 |
| | SEP UPPER R6 | | | | | TL | 5 Broken Bracket | 02/15/10 3:30 |
| | | | | | | TL | Fit & Cement | 02/15/10 3:30 |
| | | | | | | TL | BBX1 F&C UR6 | 02/15/10 3:30 |
| 12/14/09 | 4 Arch Adjustment | | .1622 | | | LS | 4 Arch Adjustment | 02/15/10 3:30 |
| | 4 Retie | | | | | LS | 4 Retie | 02/15/10 3:30 |
| | 11 Intrusion Arch | | | | | LS | CK INTR. | 02/15/10 3:30 |
| | BBX1 F&C UR6 AND NEW INTR. AW RETIE UPPER | | | | | LS | | / / |
| 01/14/10 | 4 Check Upper Intrsuion | | | | | SG | 4 Check Upper Intrusion | 02/15/10 3:30 |
| 02/15/10 | 4 Retie Upper | G | .1622 | | | LS | 4 Check Upper Intrsuion | 12/31/99 12:0 |
| | | | | | | LS | 4 DR G CHECK PT | 04/02/10 11:4 |
| | | | | | | LS | OCS BETWWENUL6-UL3 | 12/31/99 12:0 |
| 04/02/10 | 4 Arch Adjustment | G | .16X22 | .16X22 | | LS | 4 IMPRESS LOWER IND | 04/22/10 2:40 |
| | 5 Broken Bracket (1) | | | | | LS | | / / |
| | 4 DR G CHECKED PT | | | | | LS | | / / |
| | BBX1 UR1, ADD OCS | | | | | LS | | / / |
| 04/02/10 | Sep/Imps. | | | | | CAT | 2,3,4 BOND U/L INDIRECT | 05/11/10 1:10 |
| 04/22/10 | 4 IMPRESS LOWER IND | G | | | | Bri | 3,4 BOND LOWER INDIRECT | 05/11/10 1:10 |
| 04/22/10 | Appointment Cancelled (05/11/10 @ 1:10) | | | | | CAT | 2,3,4 BOND U/L INDIRECT | 12/31/99 12:0 |
| 05/11/10 | 3,4 BOND LOWER INDIRECT ONLY    Z2012 | G | | .018 NiT | | LS | 4 Retie Upper | 07/02/10 09:0 |
| 05/17/10 | Patient called for emergency | | | | | DD | 4 Emergency Appt. | 05/17/10 2:10 |
| | 4 Retie Lower | | | | | TL | | / / |
| | 5X1 LR1 | | | | | TL | | / / |
| 05/17/10 | Rescheduled Appointment (07/02/10 @ 09:00) | | | | | DD | 4 Retie Upper | 06/14/10 3:30 |
| 06/14/10 | 4 DR G CHECKED PT | G | .16X22 | | | Bri | 4 CK E'S | 07/16/10 09:4 |
| | 4 Retie Upper | | | | | Bri | BOND UL5 AND UR3 | 07/16/10 09:4 |
| | 4/6 L&R | | | | | Bri | | / / |
| 07/08/10 | Patient called for emergency | | | | | LL | Patient called for emergency | 07/08/10 09:5 |
| | 4 Retie Upper | | | | | TL | | / / |
| | Emergency Appt. | | | | | TL | | / / |

4 oF 14

| Date | Description | | | | | Init | Next | Date2 |
|---|---|---|---|---|---|---|---|---|
| 07/16/10 | 4 Retie U/L | F | .16X22 | .16X22 | | Dus | 4 Retie U/L | 08/06/10 3:30 |
| | 5x1 lower rt 2 pt was eating something hard | | | | | Dus | BOND UPPER LT 5, RT 3 | 08/06/10 3:30 |
| 08/06/10 | 4 DR G CHECKED PT | P | .018 | | | SG | BOND LOWER BB'S | 08/09/10 12:1 |
| | 5X2 UPPER 1'S GOT KICKED IN MOUTH BOBDED UL5 | | | | | SG | | / / |
| 08/09/10 | 5X2 LR2 LL1 | P | | .16X22 | | SG | BOND UPPER RT 3? | 09/03/10 12:5 |
| 09/03/10 | ST Rotations | P | .018 | .16X22 | | SG | 4 Retie U/L | 10/07/10 10:1 |
| | 4 Retie Upper | | | | | SG | BOND UR3 | 10/07/10 10:1 |
| | UNABLE TO BOND UR3 NOT IN ENOUGH | | | | | SG | | / / |
| 09/03/10 | Moved (10/07/10 @ 10:10) | | | | | GO | 4 Retie U/L | 10/07/10 12:0 |
| | Moved (10/07/10 @ 10:10) | | | | | GO | BOND UR3 | 10/07/10 12:0 |
| 09/16/10 | Moved (10/07/10 @ 12:00) | | | | | GO | 4 Retie U/L | 10/07/10 12:0 |
| | Moved (10/07/10 @ 12:00) | | | | | GO | BOND UR3 | 10/07/10 12:0 |
| 09/16/10 | Rescheduled Appointment (10/07/10 @ 12:00) | | | | | GO | 4 Retie U/L | 10/07/10 12:0 |
| | Rescheduled Appointment (10/07/10 @ 12:00) | | | | | GO | BOND UR3 | 10/07/10 12:0 |
| 09/20/10 | 9-20-10 called pt to r/s the 10-7 appt to | | | | | KM | | / / |
| | 10-19 | | | | | KM | | / / |
| | mailed letter to pt to r/s the 10-7 appt | | | | | KM | | / / |
| 09/21/10 | Moved (10/07/10 @ 12:00) | | | | | GO | 4 Retie U/L | 10/07/10 4:30 |
| | Moved (10/07/10 @ 12:00) | | | | | GO | BOND UR3 | 10/07/10 4:30 |
| 09/21/10 | Rescheduled Appointment (10/07/10 @ 4:30) | | | | | GO | 4 Retie U/L | 10/07/10 4:30 |
| | Rescheduled Appointment (10/07/10 @ 4:30) | | | | | GO | BOND UR3 | 10/07/10 4:30 |
| 09/23/10 | Moved (10/07/10 @ 4:30) | | | | | LL | 4 Retie U/L | 10/19/10 3:1 |
| | Moved (10/07/10 @ 4:30) | | | | | LL | BOND UR3 | 10/19/10 3:1 |
| 10/19/10 | 4 Place Lower FPC | P | .018 | .16X22 | | TH | 4 DR G CHECK PT | 12/01/10 3:00 |
| | 4 Retie Upper | | | | | TH | | / / |
| | POH OHI GIVEN | | | | | TH | | / / |
| 11/05/10 | Patient called for emergency | G | .018 | .16X22 | | JR | Patient called for emergency | 11/05/10 1:0 |
| | PT CALLED IN HAS A POKEY WIRE | | | | | JR | | / / |
| | ST Rotations | | | | | TH | | / / |
| | 4 Retie U/L | | | | | TH | | / / |
| 12/01/10 | BROKEN APPOINTMENT (12/01/10 @ 3:00) | | | | | JR | 4 DR G CHECK PT | 12/10/10 10: |
| 12/10/10 | 4 DR G CHECK PT | F | | | G | LS | 4 Retie Upper | 01/10/11 12:1 |
| | 4 Place Lower FPC | | | | | LS | 4 Place Lower FPC | 01/10/11 12:1 |
| | 4 Retie Upper | | | | | LS | Reposition | 01/10/11 12:1 |
| | start 4/6 r 34/56 l HAS 018 NITI PER DR.G | | | | | LS | BOND UR3 5/30 RP | 01/10/11 12:1 |
| | WILL CHANGE NEXT VISIT WHEN BOND UR3 | | | | | LS | | / / |
| 01/10/11 | Rescheduled Appointment (01/10/11 @ 12:10) | | | | | TW | 4 Retie Upper | 01/17/11 3:0 |
| | Rescheduled Appointment (01/10/11 @ 12:10) | | | | | TW | 4 Place Lower FPC | 01/17/11 3:0 |

5 OF 14

**Allgood, Samantha**

06-04-96

201 Chattanooga Rd.   383-6862
Amarillo, Texas 79118   433-6862

☐ Male    Comp No. 516817684

☐ Female   Ret Model No. _____

N

A  Dentist: _____

234 782 5521   10/8/09 - 10/8/12

P. Parent: Randall Allgood  681-5130

Phone: _____

Auth: _____

Cell: _____   **ORTHOCHART**

? UR3 ↓TL5

↑L intrusion   · Review six months.

| L | 7 | 6 | 5 | 4 | 5 | 6 | 7 | R |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |

| DATE | TIME | | OH | EI | TODAY | NEXT VISIT | WIRE | WHEN | CEPH | PAN | PIX | IMP |
|------|------|---|----|----|-------|-----------|------|------|------|-----|-----|-----|
| | 3:00 | EXAM | | | | | | | | | | |
| | | RECORDS | | | | | | | | | | |
| | | | | | (1 4) ↑imp only  ⑯ | impress ↑ind | | | | | | |
| 11-17 | 11:20 | | | | (3 4) Bond ↑'s ID  TAM | bond ↑ind | ↑O/8 mth | 5/ | | | | |
| 12-10 | 3:00 | CA | | | | ④Re-engage FAC ↑R6 | | 5/10 | | | | |
| 12-4 | 13:30 | | | | Bld v ④sep TR6  T2 | | | | | | | |
| 12-14 | 1:15 | | | | (1)BBL ↑R Lo Retie new↑intr. | | ↑L622KC | | | | | |
| 1-14 | 1:30 | | | | (2) | SG-④CK↑intr | | 5/10 | | | | |
| 2-15-10 | 3:30 | | | | ④ cont↑intr  IS | ↑intr Dr CW | | 5/1 | | | | |
| 4-2-10 | 11:40 | | | | ↑BBX1 ↑R1 DrE | S④ occs between 111T6-11135 | | 5/10 | | | | |
| 4-22-10 | 2:40 3:40 | | | | ④imp↓ind | BBX↑ ④imp↓ID | | 4/10 | | | | |
| 5-11-10 | 1:10 | bond | | | ③bond↓ID  IS | ④③bond↓ID 018mth | | 5/10 | | | | |
| 1-2-10 | 9:00 | | | | | ④Re-engage↑ | | 5/10 | | | | |
| 5-17-10 | 2:10 | BB | | | ④6X1 UR1  T2 | | | | | | | |
| 2-2-10 | 9:00 | (RS) | | | | ①Re-eng↑ | | | | | | |
| 6-14-10 | 5:30 | | | | ④Dr.v Ret. Start E's  BK | Bond ↑L5 & ↑R3 | | 5/20 | | | | |
| 7-16-10 | 9:40 | | | | ⑨L wire out andspy retied ↑T | | | | | | | |
| 7-16-10 | 9:40 | | | | ④S 1/UR2 & Rete TU | ④Bond↑L5,↑R3,↑intr | | 5/20 | | | | |
| 8-10-10 | 3:30 | | | | | Bond ↑L5, ↑R3 | | | | | | |
| 8-9-10 | 12:10 | | | | SC | | | | | | | |
| 9-13-10 | 12:50 | | | | | | | | | | | |
| 10-7-10 | 12:00 | | | | 1:50pm Cm for pt to RS this appt to the 10/6 | Mailed letter to patient | | | | | | |
| 10-19-10 | 3:10 | | | | | | | | | | | |
| 12-1-10 | 3:00 | MA | | | | | | | | | | |
| 11-5-10 | 1:30 | | | | SOS poke wire | | 6 OF 14 | | | | | |

When the Feds came in to the office on April 22, 2010 Mr. Sam Martin, CPA and Marc White, FBI told us it was fraud to pay Dr. Baron with a 1099 form;

- We immediately filed for group application.
- This process required for Dr. Baron to move his TPI #157232302 from Lab Tech to Goodwin Orthodontics PLLC and the process took months.
- **A Q 6 number was given as a Temporary number**
- **In October of 2010** we received first response for the group application
- **Major issue was extension of time to answer their change request**
- **October 22, 2010** we received the group application. **Kintana #4050836**
- Made changes and sent it back to TMHP Ticket #731730404
- In November of 2010 received some more changes. Ingrid calls TMHP Ticket #731732470
- Ingrid called **Jordan Ticket #731753583** and Jordan told Ingrid that a group application was not needed for subcontracted doctors and we should cancel group application.
- Ingrid and Patty fax a letter requesting cancellation of Kintana #4050836.
- Ingrid called **Isabella Ortiz 512-506-7478** and was told that we needed a group application and all subcontract doctors had to be included in the group application.
- Ingrid called TMHP and spoke to **Phoebe Ticket #731734155** and asked her to remove our letter requesting cancellation of group application. **Phoebe assured** us the letter was removed.
- Since we received subsequent correspondence form Medicaid dated November 19th our Kintana # 4050836 was still active.
- In November 30, 2010 received another request changes to TMHP. All they needed was an EFT Notification form. This had to be signed and mailed.
- December 27th 2010 sent signed EFT form with letter to TMHP.
- February 4, 2011 received letter from TMHP denying group application request due to on going investigation.
- Sent letter regarding denial and requesting a formal appeal of that denial.
- Dr. Olesen received a letter from TMHP giving a final decision on his group application.
- They denied his application
- Dr. Baron never received a letter of denial

6. <u>**We should have been allowed "Due Process" to make these changes.**</u>



**TMHP**   TEXAS MEDICAID & HEALTHCARE PARTNERSHIP
A STATE MEDICAID CONTRACTOR

PO Box 200795
Austin, TX 78720-0795
1-800-925-9126
Fax 1-512-514-4214

Michael Goodwin
3629 Wolflin
Amarillo, Tx 79102

Initials: Mp      Date: 10/22/2010      Kintana 4050836

Dear , Michael Goodwin

Thank you for your application to enroll in the Texas Medicaid Program. The attached forms are being returned to obtain additional information. To continue processing your application, we must receive the requested information within 30 days of the date of this letter.

If your application was submitted online through the TMHP Provider Enrollment on the Portal (PEP), you can submit updates through PEP by choosing "View Existing Transactions", selecting the portal ticket number of the application you wish to update, and clicking "Edit". After making the necessary revisions, submit the application by navigating to the "Final Acknowledgement" screen at the end of the application and click "I Accept".

If you submitted a paper enrollment application, you must submit revisions, along with a copy of this letter, to:

Texas Medicaid & Healthcare Partnership
Attn: Provider Enrollment Department
PO Box 200795
Austin, TX 78720-0795

Pages that do not require your signature can be faxed to 1-512-514-4214.

If you have any questions, please call the TMHP Contact Center at 1-800-925-9126, and select Option 2.

Please do not submit claims for services provided to eligible Medicaid clients until you have completed your enrollment with TMHP and received a letter with your Texas Provider Identifier (TPI). After you have received your TPI, please submit claims promptly to ensure that claims are received within 95 days of the date of your enrollment in the Texas Medicaid Program.

Your application is being returned because your application is missing information on one or more of the following documents:

**Texas Medicaid Identification Form**

☐ Please clarify how we are to enroll you by checking the appropriate boxes.

**Section A—Provider of Service Information**

☐ Please provide a valid National Provider Identifier (NPI)/Atypical Provider Identifier (API).

☐ The entity type for the NPI does not match the type of provider enrolled with TMHP. The NPI Final rule defines an Entity type 1 as a person and Entity type 2 as providers that are organizations (not individuals), such as hospitals, clinics, laboratories, ambulance companies, and provider groups.

www.tmhp.com

## TIME LINE

US Attorney told potiential Medicaid staff that would testify on My behalf, Not to tALk to or help us.

1) On or About May, June 2009, When Calling Medicaid And Asking for Answers to Medicaid procedures, the representAtive would offer us No help.

(2) Not Long After the Medicaid Field representAtive, MRS, Singleton, Would Not come to our office or provide Any Answers to our questions. Much Later She Came to our office to inform us, She Could No Longer help us.

(3) Our origional District Medicaid representAtive, would Not come to our office to help us review our practices And procedures that was requested Many times. She made Multiple excuses As to why She could Not come. When We were persistAnt, She Said A New District representAtive wAs being trained And would tAke About A year before she completed her training.

(4) About one year Later, a New District Medicaid representAtive came on board. She Also made excuses why She could Not come to our office to introduce herself or review our practices And Procedures. At one Such Conversation, She was Accross the Street And would Not MAKE the time to come by the office. This Continued until we Closed.

(5). Mr. James Cooper, Medicaid representative for Complaints, did in fact try to help us on several occasions. He aided in bringing many things into compliance. When I was charged with Medicaid Fraud, I asked him for a Letter to the Judge explaining how hard we were trying to as Compliant as possible. His response was, " I have been told not to get involved."

We were working hard to comply with Medicaid rules and regulations. However, we had little or no help from most of Medicaid representatives. Shut out of any help, Clark Holesinger said My defence would be compromised with out the verification of Mr. James Cooper

(2)

Michael D. Goodwin
Reg. No. 44899-177
F.P.C. Terre Haute
Terre Haute, IN 47808



April 9, 2014

Clerk of the Court
United States District Court
    For the Northern District of Texas
    Amarillo Division
205 E. 5th Street, Room 133
Amarillo, TX79101

Dear Clerk of the Court:

Please find enclosed my Habeas Corpus Petition with one complete
original, one copy without exhibits and a separate copy of the
motion with a separate caption page. Please docket the Motion with
your Office, retain the complete Original for your records, and
stamp FILED the separate copy of the Motion and its separate caption
page. Please return to me the stamped FILED Motion and caption page
in the enclosed stamped addressed envelope.

Thank you for your attention and assistance in this matter.


Cordially yours,

Michael D. Goodwin
Reg. No. 44899-177



encl:   Motion and exhibits (one original)
        Motion only (one copy)
        Motion page and header page (one copy)
        sase

cc:     U.S. Attorney
        file



U.S. OFFICIAL MAIL
PENALTY FOR PRIVATE USE $300
UNITED STATES POSTAGE
$ 00.00°

02 1A
0004208463

APR 09 2014
MAILED FROM ZIPCODE 47802

Justice
FOREVER

⟨⟩44899-177⟨⟩
Michael Goodwin Sr.
PO BOX 33 fpc
SO2
Terre Haute, IN 47808
United States

⟨⟩44899-177⟨⟩
Clerk Of The Court
Clerk Of Dist. of Texas
Northern Street, Room 133
205 E. 5th Street
U.S. District Court
Amarillo, TX 79101
United States

RECEIVED
APR 1 4 2014
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

INMATE
IDENTIFICATION
CONFIRMED