UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff (Respondent).<br><br>v.<br><br>MICHAEL DAVID GOODWIN<br>Defendant (Petitioner). | ) <br>) Criminal I Case Information<br>)<br>) Hon. Judge Mary Lou Ronbinson<br>) Case No. 2:12-CR-037-J<br>)      2:14-cv-91<br>) |

# MOTION TO AMEND MOTION UNDER 2255

## ALL GROUND FOR RELIEF FOR PETITIONER'S MOTION TO AMEND MOTION UNDER 2255

COMES NOW Petitioner (Defendant in the above mentioned matter), Michael David Goodwin Pro Se, And states as follows:

## DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL

This petitioner believes that attorney Clark Holesinger's failure submits to the court exculpatory evidence that would have resulted in a different outcome. **Enclosure 4** is a copy of Cristine Miller's, Medicaid expert, "draft" report of her findings on the Medicaid procedures that were occurring during the time Goodwin Orthodontist PLLC was in practice, January 2008 to November 30, 2011. Attorney Clark Holesinger hired Christine Miller, Medicaid expert on November 30, 2011, See **Enclosure 5.** This report came to light on, July 11, 2014.

Case No. 2:12-CR-037-J

## MOTION TO AMEND MOTION UNDER 2255

On July 11, 2014, this petitioner's brother-in-law, Jaime A. Gomeztagle, made phone contact with Cristine Miller, Medicaid expert, concerning her expert Medicaid investigation on the procedures Goodwin Orthodontics PLLC. On this date Cristine Miller, Medicaid expert, informed Jaime A. Gomeztagle that she had not heard from Clark Holesinger concerning her favorable findings on her evaluation of Medicaid practices occurring in Goodwin Orthodontics PLLC. See **Enclosure 4** is a "draft" of her findings. Cristine Miller has informed this Petitioner's brother-in-law, that she requires a letter of engagement from an attorney in order for her to continue to disclose her evaluation on Goodwin Orthodontic PLLC. At present I am unable to hire an attorney to ask for a letter of engagement.

Clark Holesinger's, lack of effective counsel in order to embezzle Medicaid funds and have this petitioner incarcerated, has left me without funds to properly submit exculpatory evidence to this Honorable Court.

Again, had Clark Holesinger submitted to this Court these findings by this Medicaid expert, Cristine Miller, the results of these convictions would have **not prevailed.**

### CERTIFICATE OF SERVICE

I, Michael David Goodwin, certify that a TRUE and accurate copy of the foregoing was filed with the United States District Court for the Northern District of Texas, Amarillo Division, by placing the documents in the F.P.C. Terre Haute's legal mailbox and / or handed these documents to the appropriate Federal B.O.P. officials, consistent with the Houston v. Lack mailbox rule, with First Class postage.

Michael David Goodwin #44899-177      Received by:_____ __/__/__

May 2, 2012

Mr. Clark W. Holesinger
Attorney at Law
334 W 806 N
Valparaiso, IN 46385

Dear Mr. Holesinger:

Re: Goodwin Orthodontics

As you requested, the following letter outlines the facts and my opinions regarding the Goodwin Orthodontics matter.

On March 20, 2012, I traveled to Amarillo, TX to evaluate the Goodwin Orthodontic practice and their business practices related to the accusations made by the Texas Department of Medicaid Services and the Department of Justice.

During my visit, I met with Dr. Goodwin, Annette Hastings, the office manager, Denise and Teresa, both billing clerks in the practice. In my discussions with these individuals, I was provided with significant information about the history and the billing practices of Goodwin Orthodontics.

History of the Practice Acquisition

Dr. Michael Goodwin acquired anorthodontic practice in March, 2008. This practice was purchased from a Dr. Osborne who resided in Amarillo. This practice serviced mainly Texas Medicaid patients. At the time of the purchase, Dr. Osborne was very ill and actually died a few months later. His wife was primarily involved in the management of the practice and oversaw the office processes including the Medicaid billing processes.

At the time of that acquisition, Mrs. Osborne suggested that Dr. Goodwin retain the employees from the existing practice because they had experience in Medicaid billing rules and regulations. Prior to the acquisition of this practice, Dr. Goodwin had never serviced Medicaid patients, either in his practice in Indiana or in other practices where he worked as a locum tenens (a provider that works for a practice for a limited amount of time, sometimes replacing an ill provider or one who happens to be on vacation). Dr. Goodwin had no experience in Medicaid billing, Medicaid policies and procedures or anything related to a government healthcare reimbursement program.

When an orthodontist is licensed in another state, most dental insurances do not require any type of credentialing of the provider other than proof of licensure by the particular state in which he will practice orthodontia. If they are a part time provider or a locum tenens, they don't even require that notification. Because of that, Dr. Goodwin was not aware of the need to have a part-time orthodontist credentialed with the Texas Medicaid system. He believed that if he was licensed in the State of Texas, he was qualified.

Dr. Goodwin did not understand the implications of incorrectly submitting bills to Medicaid and the consequences related to those billing errors. He had no involvement in the billing aspect of the practice.

Goodwin Orthodontics Medicaid billing history

After discussing Medicaid and general billing practices with Ms. Hastings and the current billing staff, the following facts surfaced:

- The current Medicaid billing practices followed by the Goodwin Orthodontics staff have carried forward from the original Osborne billing staff. Current billing staff was trained by staff that was trained by the Osborne staff prior to the initial Osborne staff departing from the Goodwin Orthodontic practice.
- The current staff has no prior experience in orthodontia billing, including Medicaid billing policies and procedures.
- The current billing staff did attend ongoing Medicaid training presented by the Texas Department of Medicaid Services, but they did not learn anything that would have directed them to change their Medicaid billing methodology. If they did hear something about changing the methodology, they did not understand the process or the change.
- As the practice grew, Medicaid billing practices remained unchanged.
- Prior to the implementation of the current dental record and billing system, the practice used a paper dental record system and the online billing program provided by the Department of Medicaid Services.
  - From 2008 through November 30, 2010, when patients were approved for Medicaid orthodontia services, their information was entered into an appointments scheduling system. This system scheduled appointments only. There was no billing, accounts receivable or dental record function.
  - From December 1, 2010 through the current time period, a new information system has been implemented. This information system includes appointment scheduling, medical record documentation, billing, accounts receivable management and reporting.
- As the billing department had no experience in healthcare or orthodontia billing of any type, they also had no experience in managing the accounts receivable function for the practice. In Dr. Goodwin and Ms. Hastings prior experience, the dental insurance paid a flat one-time fee and the patient was billed the balance as a lump sum payment or, more commonly, a monthly payment until the treatment was completed and the fee paid in full.

- The billing staff has no concept of "follow-up" or collection procedures to insure accurate billing and payment.

Analysis of Goodwin Orthodontics

- Very few patients are private pay or private insurance. The majority of patients are Medicaid eligible. Therefore, knowledge of Medicaid billing policies and procedures are imperative for the practice to be reimbursed correctly.
- Patients travel from great distance to see Dr. Goodwin (see attachment 1, service area). However, Dr. Goodwin does not advertise. He relies on referrals from participating Medicaid dentists and word of mouth.
- **Because of the lack of billing and accounts receivable expertise by his billing staff, it appears that Dr. Goodwin's practice has not resubmitted Medicaid bills in the amount of $40,272.72 (See Attachment 2) from December 1, 2010 forward. Between March 1, 2008 and November 30, 2008, we have no way of knowing how much Medicaid billing went unpaid, because the practice did not track any accounts receivable information. Once it was billed, unless there was a denial noticed on the R & S reports as received from Medicaid, there was no method of identifying missed or improper payments. For this time period, only the Medicaid intermediary has the ability to show how much was billed and denied or not paid. This number is also probably not accurate because it is impossible to know how much was billed and never received by Medicaid.**
- *Let's ask Medicaid for a complete payment record to Goodwin from March 1, 2008 through November 30, 2008.*
- When reviewing the information system that had been implemented in December of 2010, an accounts receivable report was requested. The staff didn't know how to run an accounts receivable report, didn't know how to format the report and didn't know the purpose of reviewing an accounts receivable report. When the report was produced, the system noted that the report had not been produced since the system was implemented in December of 2010. The report showed a balance of charges that were over 90 days past due in excess of $40,000.00. Medicaid allows bills to be resubmitted as long as the last bill submitted or the charges are not past 95 days old. Because the practice could not work these reports immediately, all of the charges would be ineligible for rebilling because of the timely filing limit.
- *Is this the same $40,000 as Attachment 2?*
- The billing office does not balance either the charges or payments per day to what is posted to the accounts receivable system. There is potential for charge capture issues and incorrect payment posting.
- **Services that should have been billed were not and nonallowable services were billed incorrectly because of the lack of expertise of the billing staff and the lack of practice knowledge of the Medicaid system.**
    - o  Impressions on patients where prior authorizations were requested were taken. If the patient was approved for Medicaid services; the impression was billed as

an adjustment (the training provided by the former Osborne staff indicated that this was an appropriate practice).
- For a very limited time in 2011, the staff was informed by the Medicaid staff that they were allowed to bill $15 for every patient when preauthorization was denied. That practice has been discontinued.
- *If they did this, did Medicaid ever pay?*


- The practice that was allowed for billing for services for nonauthorized patients (as outlined in the Provider Manual, see Attachment 3) was never billed. In the billing manual for Medicaid services, the documentation states that a limited number of preauthorization services for nonapproved patients may be billed, "If a case is not approved, the dentist may file a claim for payment of the diagnostic workup for procedure codes that were necessary to request the prior authorization (procedure codes D0330, D0340, D0350 and D0470). The dentist may receive payment under these procedures for no more than two cases out of every ten cases denied. The dentist should determine if the client's condition meets orthodontic benefit criteria before performing a diagnostic workup." Page CH-184, Texas Medicaid Provider Procedures Manual: Volume 2

Recommendations

The Medicaid billing requirements for orthodontia services in Texas are relatively simple if the staff is appropriately trained, supervised and follows accepted policies and procedures. In addition, controls must be put in place to insure against incorrect billing and potential malfeasance from any individual having access to cash and the accounts receivable system.

The following recommendations are made to estimate the dollar amount of overpayments that were made to Goodwin Orthodontics and to estimate underpayments of the allowed services that were either not paid or not billed to Medicaid. These amounts will be an estimate because of the lack of recordkeeping that was performed by the Goodwin Orthodontic office.

As discussed earlier, impressions were billed incorrectly on patients that were authorized for orthodontia services. These services were billed by utilizing an incorrect code so we are unable to run a report on that code to determine the amount of overpayments. However, because of the procedure used by Goodwin Orthodontics in the scheduling of these patients, a reasonable estimation can be made based on when the patient was seen and their appearance in the current billing system. Because there were two different appointment and billing methodologies, there will be two separate methods based on the time periods when the patients were authorized for orthodontia services.

The methodology for determining overpayments for the time period from March 1, 2008 through November 30, 2010:

4 of 6

- All impression appointments were made for the same day or two day period every month. The appointment schedule notes that these appointments were specifically for impression or new patient appointments. Because the time frame for patient treatment for orthodontia is usually more than 21 months, the patients who were approved during that time period should have been re-registered in the new accounts receivable system as patients.

    - Restart the old appointment scheduling system.
    - Identify the dates of services when new patient (impression) patients were scheduled
    - Print the appointment schedules for those dates and identify the patients who were seen on those dates of service
    - Compare the names on the appointment schedules to the names on the current billing system to see if those patients were authorized for orthodontia services. If they are not entered into the current system, they were denied.
    - If they are on the appointment schedule and entered into the current system, they were approved and an impression was billed for them.
    - For that time period, we have no method to determine what services were reimbursed and which services were denied or never received by Medicaid. Therefore, in the interest of being conservative, we will consider that all impressions were billed, paid and are considered an overpayment.
    - *Let's get the Goodwin staff on this pronto.*

The methodology for determine overpayments for the timer period for December 1, 2010 through the time that the impression billing was discontinued, the process would be as follows:

- Review the appointment schedule for the appropriate time frame when new patients were scheduled (as in the previous example, all impressions are schedule monthly during the same time every month)
- Compare the new patient appointments to patients who were billed services from the accounts receivable system. Identify the initial impression services that were billed as adjustments and count those as overpayments.

Add the two overpayment totals to determine the amount of the overpayment.

However, the practice was also underpaid on many services. The $40,272.72 that was not collected by the practice for Medicaid payments that were never received should be analyzed for accuracy and a dollar amount determined as an underpayment.
*What do we have to do to be confident that we come up with an accurate number here?*

An analysis of payments for denied pre-authorizations that were never billed should be analyzed as an underpayment. This would be evaluated as follows:

5 OF 6

- Appointments were scheduled during both time periods for all new patients, regardless of whether or not they were preauthorized by Medicaid. The practice would not be aware of a preauthorization until after the impression had been performed and the preauthorization report submitted to Medicaid. Therefore, the patients identified during the first procedure that were not in the current system would be patients who were denied preauthorization and twenty percent of those patients should have received the payments from Medicaid identified previously in this report. Those amounts would be considered underpayments.
- *Again, staff needs to do this.*

After all the analysis has been completed, the overpayments and the underpayments would be combined to determine the extent of the damages either due to or due from the Texas Department of Medicaid Services.

In addition, the staff needs training in Medicaid billing policies and procedures, basic office procedures, and accounts receivable management. Financial controls should be put into effect and monitored closely. Charges, payments and adjustments should be balanced daily. Ongoing compliance training should be provided to both the staff and the providers.

In conclusion, this practice did not have the background or expertise to bill Medicaid for Orthodontic services. In all likelihood, the Dr. Osborne's practice probably committed the same errors for a longer time period than was the case for Dr. Goodwin. Because these billing practices were continued in the Goodwin practice and experienced billing staff was not hired to supervise or perform the billing services, the errors continued.

However, the ability required and the information required for the Goodwin practice to continue to serve the Texas Medicaid orthodontic population are readily available to Dr. Goodwin. The current staff is willing and able to understand and change the inaccurate Medicaid billing practices and has already ceased those practices. In addition, the current staff understands how the current billing system is used and have been trained for that billing system. With some guidance and education, this staff can provide quality and accurate Medicaid billing for the practice.

*Good conclusion. It sounds like the possibility for a happy ending.*

The information contained in this document is covered under Attorney/Client privilege.

November 30, 2011

Mr. Clark W. Holesinger
Attorney at Law
334 W. 806 N,
Valparaiso, IN  46385

RE:  Litigation Support

Dear Mr. Holesinger:

This letter constitutes an agreement between Clark W. Holesinger, Attorney at Law (CH) and Mountjoy Chilton Medley, LLP under which we will provide litigation support services, as an expert consultant in connection with your representation of client.  We will work under the direction of Mr. Holesinger or designee at CH.  This work contemplates services of a character and a quality which would be necessarily adjunct to CH's services as attorneys, and will aid CH in its provision of legal services to the client.  It is contemplated that all such work will have the full advantage of the confidentiality available to Mountjoy Chilton Medley LLP under the attorney-client privilege and work product doctrine.

In connection with said engagement, all communications between Mountjoy Chilton Medley LLP and the client as well as communications between Mountjoy Chilton Medley LLP and any attorney, agent or employee acting in its behalf, or any attorney, agent or employee acting on behalf of a co-defendant in which the client shares a joint defense privilege, shall be regarded as confidential and made solely for the purpose of assisting counsel and giving legal advice to the client.  Mountjoy Chilton Medley LLP will not disclose to anyone, without written permission, obtained in advance, the nature or content of any oral or written communications, nor any information gained from the inspection of any record or documents submitted to Mountjoy Chilton Medley LLP including information obtained from corporate records or documents, and that Mountjoy Chilton Medley LLP will not permit inspection of any papers or documents without the permission of CH, in advance.

All work papers and other documents used by Mountjoy Chilton Medley LLP during this engagement will be maintained in segregated files, and such originals will be returned to CH upon the completion of this engagement.  Work papers, reports, records, transcripts, schedules, documents, all information secured or analyses prepared by Mountjoy Chilton Medley LLP or under its direction, belong to CH.  Any written documents, records, reports, schedules, transcripts, work papers, and all information secured or analyses prepared or produced by Mountjoy Chilton Medley LLP in working on the project must be designated as "Privileged and Confidential/ Attorney Work Product."  When appropriate, such documents should also indicate that they have been prepared at the request of CH, and all such documents should reflect to whom they have been disseminated.

ENCLOSURE 5
1 of 4

Case 2:14-cv-00091-J-BB   Document 10   Filed 07/21/14   Page 10 of 14   PageID 202

The information contained in this document is covered under Attorney Client privilege.

Clark Holesinger
November 30, 2011
Page Two

As part of the agreement to provide expert consulting services in this matter, we will immediately notify CH of the happening of any one of the following events:

1. The exhibition or surrender of any documents or records prepared by or submitted to us or someone under your direction, in a manner not expressly authorized by CH;

2. A request by anyone to examine, inspect, or copy such documents or records;

3. Any attempt to serve, or the actual service of, any court order, subpoena or summons upon us which requires the production of any documents or records. We will immediately return all documents, records, reports, schedules, test results, transcripts, work papers, and all information secured or analyses prepared for you at your request.

CH will provide Mountjoy Chilton Medley LLP with all documentation and information that we request or it will be provided by the staff of client. If information becomes known that would make the continued involvement of Mountjoy Chilton Medley LLP in this engagement inappropriate, or if the attorney or parties involved change, it reserves the right to withdraw from this engagement. In addition, Mountjoy Chilton Medley LLP will refuse to perform any requested act that we deem a violation of law, public policy or our professional ethical standards, and may, as a result, withdraw from the engagement without penalty.

The value of our firm's services to CH and its client is founded, in part, on its reputation for professionalism and integrity. Mountjoy Chilton Medley LLP firm has been engaged from time to time by a significant number of law firms, both locally and nationally, and it is possible that it is or have been engaged by firms representing clients adverse to clients of CH in this matter. The engagement of Mountjoy Chilton Medley LLP is expressly conditioned on an agreement not to use the fact of its current, previous or possible future engagement by opposing counsel in other matters as a means of enhancing or diminishing Mountjoy Chilton Medley LLP's credibility in conjunction with any appearance before a trier of fact.

It is understood that Mountjoy Chilton Medley LLP has been retained for this engagement by Mr. Clark Holesinger. As such, its billings will be sent to Mr. Holesinger (and copies to client). It is agreed that our fees are in no way contingent on the nature of its findings, or of any analyses, testimony, or the outcome of any proceeding. However, Mountjoy Chilton Medley LLP understands and acknowledges that Mr. Holesinger will forward our bills client and payment for our services is the sole responsibility of client and not Mr. Holesinger.

We will submit bills to you monthly, payable upon receipt, which will be based on our standard hourly consulting rates ranging as outlined in the chart below, plus out-of-pocket expenses. Our fees are based on the time required by the professionals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and the skill required. Our rates are adjusted periodically, usually on an annual basis. We reserve the right to defer rendering further services until payment is received on past due invoices. Prior to beginning work, we will require a retainer of $15,000.00. Any services will be billed against this retainer with any overage returned at the end of the engagement.

3 OF 4

Clark W. Holesinger
November 30, 2011
Page Three

| Level | Approximate Hourly Rates |
|---|---|
| Staff Consultant | $115 |
| Senior Consultant | 130 |
| Supervisor | 150 |
| Manager | 180 |
| Project Manager | 180 |
| Partner | 295 |

Services will be paid within thirty days of invoice. If said payments are not received, work on the litigation support project addressed by this letter will cease immediately until all accounts are brought current.

If any portion of this letter is held to be void, or otherwise unenforceable in whole or part, the remaining portions of this letter shall remain in effect.

This Agreement is effective November 11, 2011 If this Agreement is in accordance with your understanding and meets with your approval, please sign and date this letter in the space provided. If the need for additional services arises, our Agreement with you will need to be revised. It is customary for us to describe these revisions in an addendum to this letter.

Disputes arising under this Agreement (including the scope, nature and quality of services to be performed by us, our fees and other terms of the engagement) shall be submitted to mediation. A competent and impartial third party, acceptable to both parties, shall be appointed to mediate, and each disputing party shall pay an equal percentage of the mediator's fees and expenses. No suit or arbitration proceedings shall be commenced under this Agreement until at least 60 days after the mediator's first meeting with the involved parties. If the dispute requires litigation, the court shall be authorized to impose all defense costs against any non-prevailing party found not to have participated in the mediation process in good faith.

Except as instructed otherwise in writing, each party may assume that the other approves of properly addressed fax, email (including email exchanged via Internet media) and voicemail communication of both sensitive and non-sensitive documents, including third party confirmations, and other communication concerning this Agreement, as well as other means of communication used or accepted by the other party.

Except to the extent finally determined to have resulted from Mountjoy Chilton Medley LLP's fraudulent behavior or willful misconduct, Mountjoy Chilton Medley LLP's maximum liability to Asthma and Allergy Center, LLP or any related entities for any reason, including Mountjoy Chilton Medley LLP's negligence, relating to the services under this Agreement shall be limited to the fees paid to Mountjoy Chilton Medley LLP for the services or work product giving rise to the liability

3 0 F 4

Clark W. Holesinger
November 30, 2011
Page Four

Please sign both letters and send the copy back to us at the address listed below.

Cordially,

MOUNTJOY CHILTON MEDLEY LLP


Cristine M. Miller, CMPE, CCP, CHC

CMM/cc08-50.doc

_____
Accepted By:  Clark W. Holesinger

_____
Date:

## PROOF OF SERVICE:

I certify that an exact copy of Petitioner's response and all attachemnts were sent to AUSA's office at the following address.

<div style="margin-left:2em;">

UNITED STATES ATTORNEY
John Arlen Pruitt
Special Assistant United States Attorney
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699

</div>

By: _____   Date July 15, 2014
Micheal David Goodwin Reg. # 44899-177

INMATE IDENTIFICATION CONFIRMED
July 15, 2014

MICHAEL D. GOODWIN SO2
44899-177
TERRE HAUTE FCI
SATELLITE CAMP
P.O. BOX 33
TERRE HAUTE, IN 47808

CLERK OF THE UNITED STATES
DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
AMRILLO DIVISION
205 E. 5TH ST. RM 133
AMARILLO, TX 79101

c/o Magistrate Judge



RECEIVED
JUL 21 2014
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS